ALLIED ARTISTS PICTURE CORP., Plaintiff,

and

Avco Embassy Pictures Corp., et al., Plaintiffs-Appellants, Cross-Appellees,

v.

James A. RHODES, Defendant-Appellee, Cross-Appellant.

Nos. 80–3566, 80–3600.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 7, 1981.

Decided June 4, 1982.

Rehearings and Rehearings En Banc Denied Aug. 17, 1982.

Earl F. Morris, Harry Wright, III, Porter, Wright, Morris & Arthur, Columbus, Ohio, Robert W. Trafford, Dixon F. Miller, Alan Dershowitz, Cambridge, Mass., for Avco Embassy Pictures Corp., et al.

William J. Brown, Atty. Gen. of Ohio, Alan C. Witten, Asst. Atty. Gen., Gregory E. Young, Antitrust Section, Columbus, Ohio, for Rhodes.

Before LIVELY and MERRITT, Circuit Judges, and CECIL, Senior Circuit Judge.

MERRITT, Circuit Judge.

An Ohio statute regulating the marketing of motion pictures outlaws "blind bidding" and instead requires suppliers of motion pictures to screen their films in Ohio for all interested theater operators prior to negotiations or bidding. The second feature of the statute under attack is a set of competitive bidding guidelines. Although the statute allows producers and distributors to market films to exhibitors through negotiations rather than competitive bidding, the statute establishes guidelines for competitive bidding if distributors choose bidding as the method of marketing a film. In particular, the statute requires a disclosure of invitation-to-bid lists and the bids themselves; and if a distributor "rejects all bids submitted pursuant to an invitation to bid, he shall issue a new invitation to bid" rather than negotiate individual contracts with exhibitors. The third feature of the statute under attack significantly restricts the distributors' ability to charge theaters advance and guaranteed payments in addition to charging a percentage of box office receipts.[1]

1. The pertinent provisions of the statute are as follows:

§ 1333.05 [Definitions.]
As used in sections 1333.05 to 1333.07 of the Revised Code:

. . . .

(H) "Trade screening" means the showing of a motion picture by a distributor in one of the five municipal corporations within this state having the largest population which

Plaintiff-appellants—the country's nine major producers and distributors of films, who account for approximately ninety percent of film industry revenues—contend that the challenged provisions abridge free speech and violate the commerce clause as well as the antitrust and copyright laws. In a comprehensive opinion describing in detail the motion picture industry and its marketing practices, District Judge Duncan found no violation of federal law. 496

F.Supp. 408 (S.D.Ohio 1980). We uphold as valid the trade screening requirement and the bidding guidelines including the rebidding requirement. We remand for further consideration under the commerce clause the provisions of the statute relating to pricing methods.

I.

The Ohio statute, like similar statutes in at least eighteen other states,[2] is an out-

---

showing is open to any exhibitor interested in exhibiting the motion picture.

(I) "Blind bidding" means . . . negotiating . . . or agreeing to terms for the purpose of entering into a license agreement prior to a trade screening of the motion picture that is the subject of the agreement.

. . . .

§ 1333.06 [Certain practices of distributors prohibited; effect on license agreements.]

(A) No distributor shall engage in blind bidding.

(B) No distributor shall condition the granting or execution of a license agreement on a guarantee of a minimum payment to the distributor. If the exhibitor is required by the license agreement to make any payment to the distributor that is based on the attendance or the box office receipts at a theater at which the motion picture is exhibited.

(C) No distributor shall condition the granting or execution of a license agreement on the exhibitor's advancing, more than fourteen days prior to his first exhibition of a motion picture, any money that is to be used as security of the exhibitor's performance of the license agreement or is to be applied to any payments that the exhibitor is required by the agreement to make to the distributor.

(D) Any provision of a license agreement that waives any of the prohibitions of, or fails to comply with, this section or section 1333.-07 of the Revised Code is void and unenforceable. Any license agreement that fails to comply with this section and section 1333.07 of the Revised Code is voidable by the exhibitor, if the exhibitor gives the distributor written notice, prior to the exhibitor's first exhibition of the motion picture that is the subject of the agreement, of his intent to have the agreement voided.

§ 1333.07 [Invitation to exhibitors to bid; inspection, notice.]

(A) If bids are solicited from exhibitors . . . the invitation to bid shall specify:

(1) The number and length of runs . . .

(3) The geographic area for each run;

(4) The names of all exhibitors who are being given an invitation to bid. . . .

(B) [The invitation to bid shall include] the date, time, and location of the trade screen-

ing of the motion picture that is the subject of the invitation to bid.

(C) Every distributor shall furnish to all exhibitors in this state reasonable and uniform notice of all trade screenings that are held within this state of motion pictures that he is distributing.

(D) All bids shall be submitted to the distributor in written form. The distributor or his agent shall open all bids at the same time and in the presence of at least one of the exhibitors, or the agent of an exhibitor, who has submitted a bid.

(E) Any exhibitor, or the agent of an exhibitor, who submits a bid for a particular run of a motion picture may, at reasonable times within sixty days after the bid is opened, examine any bid that is made for the same run of the motion picture by another exhibitor . . . even if the distributor rejects all bids that are submitted. Within seven business days after a bid . . . is accepted, the distributor shall notify in writing each exhibitor who submitted a bid for that run of the motion picture of the terms of the accepted bid and the identity of the successful bidder. . . .

(F) If a distributor issues invitations to bid for a motion picture, he shall not enter into a license agreement for the exhibition of the motion picture except by means of the bidding process specified in this section. If the distributor rejects all bids submitted pursuant to an invitation to bid, he shall notify all exhibitors who submitted bids that he rejected all bids and shall issue a new invitation to bid.

2. The states which had enacted similar statutes as of mid-1981 include Alabama, Georgia, Idaho, Louisiana, Maine, Massachusetts, Missouri, New Mexico, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Utah, Virginia, Washington, West Virginia. See Joint App. at C–166.

All of these states prohibit blind bidding. Thirteen states of the eighteen states have also adopted detailed provisions regulating the bidding process: Alabama, Louisiana, Maine, Massachusetts, Missouri, New Mexico, North Carolina, Ohio, Oklahoma, Pennsylvania, South Car-

growth of the historical tug-of-war between the major companies that produce and supply motion pictures and the theaters where they are shown. Judge Duncan found that the basic state interests supporting the statute are the need to provide exhibitors with sufficient information to assess new films and reject poor ones, the need to assure fairness in bidding procedures to counteract deceptive and unfair trade practices, and the need to redress a perceived imbalance in the bargaining or market power of the major producers and the exhibitors. The statute does not have a preamble or any recorded legislative history which clarifies its purposes or articulates the underlying state interests. We are left, as was the District Court, to articulate those purposes from the text itself.

The State combines several distinct arguments in support of its view that additional information about films and fair bidding procedures are needed and that exhibitors lack adequate negotiating strength. Judge Duncan found that under blind bidding the information available to the exhibitor is often insufficient to judge the quality of the film and at times deceptive. He found that the purpose of the bidding guidelines is to counteract deception, collusion and unfair trade practices.

Judge Duncan also found that a purpose of the statute is to shift risks of loss to distributors in order to redress an imbalance in bargaining power. The perceived imbalance in bargaining power arises from the fact that movie production and distribution are concentrated in the hands of a few large companies while the theaters are more widely held by smaller entities. The story and the film techniques used, as well as the star system promoted by the producers, give some pictures a unique quality;

and the copyright laws give the distributor a monopoly in the market for individual films. Movie production for network and cable television and video cassettes bypasses theaters and gives producers a strong additional market for films. As home viewing has increased, the number of theaters has declined creating an atmosphere of market uncertainty and insecurity for exhibitors. In addition, in the 1940s and 1950s federal antitrust decrees prohibited certain tying arrangements, refusals to deal and reciprocal arrangements engaged in by producers, and the decrees required producers to divest themselves of ownership of theater circuits through which they controlled exhibition of first run movies. In effect the exhibitors and the State claim that these decrees have not adequately redressed the balance of bargaining power between the two sides and that state legislation is needed to shift the risk of loss.

The producers argue that the perceived need for additional information and fairer bidding procedures does not exist. They argue that the perceived imbalance in bargaining power also does not exist, and that even if it does, the State's attempt to shift risks away from in-state exhibitors to out-of-state distributors—one legislative purpose found by Judge Duncan to underlie the statute—is invalid under the commerce clause. They point out that neither the legislature nor the court below found any antitrust liability, monopoly power, predatory pricing or any "coercive or collusive distributor conduct," nor "any fraudulent or deceptive purpose in blind bidding." (Appellants Brief at 9.) The producers argue that the prohibition of "blind bidding"—or as they prefer to call it, "advanced licensing"—and the restrictions on bidding procedure significantly delay the exhibition of

---

olina, Virginia, Washington, West Virginia. Four states (Idaho, Utah, Oklahoma and Pennsylvania) have chosen to restrict guarantees and only two (Idaho and Pennsylvania) have restrictions on advances.

The Ohio statute which contains all three restrictions is among the more restrictive statutes. The Pennsylvania statute (more restrictive than Ohio's) was held by a district court to be invalid under the first amendment and viola-

tive of federal rights secured by the copyright laws. *Associated Film Dist. Corp. v. Thornburgh*, 520 F.Supp. 971 (1981). By contrast, a challenge to Utah's proscription of guarantees was rejected by the district court on the grounds that no significant burden was placed on first amendment rights or upon interstate commerce. *Warner Bros. v. Wilkinson*, 533 F.Supp. 105 (C.D.Utah 1982).

films in "a complex, high risk business requiring multi-million dollar investments, which depend on the vagaries of public taste," "fresh" material, and "timely release." (*Id.* at 3–5.) They argue that the statute significantly increases distributor costs and interferes with customary planning and national promotional efforts, particularly "wide release," i.e., the simultaneous release of a film in theaters across the country. They assert that the statute simply seeks "to protect the profitability of local business [theaters] at the expense of out of state business [producers and distributors]" (*id.* at 10) and reduces competition among exhibitors for films by limiting advance and guaranteed payments and by requiring full disclosure of bidders and the terms of bids. They contend that given the absence of any legitimate state interest in regulating an interstate communications industry, Ohio has exceeded its constitutional authority.

## II. THE VALIDITY OF THE TRADE SCREENING REQUIREMENT

In *United States v. Paramount Pictures*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), the seminal antitrust case which restructured the film industry, *see* M. Conant, Antitrust in the Motion Picture Industry (1960), the Supreme Court defined "blind bidding" as the "practice whereby a distributor licenses a feature before the exhibitor is afforded an opportunity to view it." 334 U.S. 157, n. 11, 68 S.Ct. at 929, n. 11. The Court approved a district court antitrust decree designed "to remedy the problems" —mainly misrepresentation and deceptive trade practices—"created by that practice." *Id.* The Court quoted language from the decree setting out some of the reasons exhibitors need accurate information about films before licensing negotiations take place. It appears from the Supreme Court opinion and from the record in this case that potential abuses arising from blind bidding have been a legitimate concern of exhibitors for many years and a bone of contention within the industry. Judge Duncan found that the exhibitors' need for accurate information about films before they buy is

real and that trade screening is the best remedy. 496 F.Supp. at 421. Judge Duncan stated that "by permitting Ohio exhibitors to view the film before bidding, it permits the exhibitors to use their own business judgment in determining whether and on what terms, to bid for a motion picture license. It effectively removes the unfairness inherent in the blind bidding process exhibitors described as 'buying a pig in a poke.'" 496 F.Supp. at 431.

■ State statutes repealing the doctrine of caveat emptor in its various forms in order to restrain possible deceptive trade practice in various industries are common. Statutes which require that buyers and sellers provide each other with accurate information about their products and services in order to counteract deceptive and misleading practices are based on legitimate state interests. The trade screening requirement here is a variation on that statutory theme. The fact that one purpose of trade screening may be, as Judge Duncan found, to redress an imbalance in bargaining power in favor of in-state exhibitors—a state interest we find highly suspect under the commerce clause (as explained in section IV below)—does not render invalid the state's legitimate interest in restraining deceptive trade practices by encouraging the flow of accurate information prior to contracting.

■ The District Court found as fact that the delays in film release caused by the trade screening requirement, although possible, appear to be infrequent and relatively minor in nature. We do not view this finding as clearly erroneous. Trade screening has been used in the industry for many years; and, as Judge Duncan found, it is content-neutral under the first amendment. We agree with the District Judge that in light of the "problems" of deception that it tends "to remedy"—using the words of the Supreme Court in *Paramount*, 334 U.S. at 157, n.11, 68 S.Ct. at 929, n. 11—it does not impose undue burdens on producers and distributors under that amendment, *see Konigsberg v. State Bar of California*, 366 U.S. 36 at 50–51, 81 S.Ct. 997, at 1006–1007, 6

L.Ed.2d 105 (1961); *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968); or the commerce clause, *see Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970); *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 126–28, 98 S.Ct. 2207, 2214–2215, 57 L.Ed.2d 91 (1978). Like the statute upheld in *Exxon* prohibiting certain types of vertical integration in the gasoline business, the trade screening requirement is facially neutral and does not distinguish between in-state and out-of-state distributors. It is true, however, as in *Exxon*, that its impact falls on out-of-state business because there are no in-state producers and distributors. This fact does not invalidate the statute, as the Court held in *Exxon*, but it may call for a more penetrating review of the burdens imposed on commerce and the state interest served. As previously noted, Ohio has an easily explained, traditional state interest supporting the trade screening requirement; and, like the District Court, we do not find a less restrictive alternative that would serve that purpose.

■ Nor does the trade screening requirement violate restrictions implicitly placed upon state regulatory authority by the antitrust and copyright laws. The prohibition of blind bidding insures more informed and rational decision making in the marketplace. The anti-competitive effects that may be incidental to trade screening— that exhibitors willing to blind bid are now forbidden to do so—are not the types of restraints the antitrust laws were designed to prohibit. For, as the Supreme Court noted in *Exxon*, "if an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the State's power to engage in economic regulation would effectively be destroyed." 437 U.S. at 133, 98 S.Ct. at 2217.

■ Even if the prohibition of "blind bidding" were shown to require behavior inconsistent with the Sherman Act, Ohio's statute regulating motion picture licensing would fall within the "state action exemption" to the antitrust laws. *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 439 U.S. 96, 109, 99 S.Ct. 403, 411, 58 L.Ed.2d 361 (1978). There is no question that the trade screening requirement is "clearly articulated and affirmatively expressed [by the state legislature] designed to displace unfettered business freedom" in methods of licensing motion pictures. *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 439 U.S. at 109, 99 S.Ct. at 411. Furthermore, the trade screening requirement is entirely self executing. This feature of the statute delegates no authority to either private parties or non-state agencies to control price, supply, demand, or market entry. Thus the "active state supervision" requirement discussed in *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc., et al.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), need not be present. The state need not itself conduct the screening in order for the exemption to apply. This is not a case in which "the state simply authorizes price-setting and enforces the prices set by private parties," as in *Midcal*, 100 S.Ct. at 943, or in which "anticompetitive conduct is 'promoted' by state action," *id.*, but is rather a case in which conduct is "compelled by direction of the State action as a sovereign," *id.* In such cases the self-executing statute itself plus judicial enforcement satisfies the supervision requirement.[3]

■ Finally, turning to the copyright preemption challenge,[4] we do not find au-

---

**3.** *See Bates v. State Bar*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), and the discussion of those cases in *Midcal*, 100 S.Ct. 943; *see also* Areeda, Antitrust Immunity for "State Action" after *Lafayette*, 95 Harv.L.Rev. 435, 436–440 & 445 n.50 (1981); Posner, The Proper Relationship

Between State Regulation and the Antitrust Laws, 49 N.Y.U.L.Rev. 693 (1974).

**4.** The producers argue that the Ohio motion picture licensing statute is preempted (1) by the express terms of § 301 of the Copyright Act, 17 U.S.C. § 301, (2) because it interferes with distribution rights granted by § 106 of the

thority for the argument that state trade regulation which affects distribution procedures and, indirectly, monetary returns from copyrighted property is invalidated implicitly or explicitly by the terms of the Copyright Act, 17 U.S.C. § 101 *et seq.* or the copyright clause. After thorough analysis, Judge Duncan rejected each of these claims, 496 F.Supp. at 441-48. We agree with his decision and his analysis.

## III. THE VALIDITY OF THE COMPETITIVE BIDDING GUIDELINES

Competitive bidding for films is not mandatory in Ohio under the statute. It is a method of selling films to exhibitors which may be used by distributors in lieu of negotiations. The Ohio competitive bidding guidelines require disclosure of invitation to bid lists and the bids themselves after they are opened; and if all bids are rejected, the distributor must rebid the film rather than negotiate with exhibitors.

We see no federal constitutional or statutory infirmity in these guidelines. Competitive bidding, like trade screening, has been widely used in the film industry for many years. *See United States v. Paramount Pictures,* 334 U.S. 131, 161-66, 68 S.Ct. 915, 931-933, 92 L.Ed. 1260 (1948). If the distributor chooses to use this method of selling, the process should be fair, and that is what the guidelines are designed to insure. The disclosure provisions are not burdensome and are designed to counteract deception and unfair manipulation of the bidding process. The rebidding requirement has a similar purpose. It keeps producers from deceptively putting films out on competitive bid in order simply to test the market without any real intention of licensing the film to the best bidders. The rebid requirement is designed to prevent this misleading trade practice.

The District Court found that the incremental burdens that these provisions placed upon the licensing process are minimal—especially since little change from

prevailing bidding practices is required and any delays because of possible rebidding, if they could not be avoided, would be rare. 496 F.Supp. at 438-440. As with the trade screening requirement, therefore, we find that no undue burdens are placed upon the rights of producers and distributors under either the first amendment or the commerce clause. The bidding procedures, like the trade screening requirement, do not interfere with any of the rights of the producer-distributors under the copyright statutes, and do not sanction any collusive behavior that is in violation of the antitrust laws. The open bidding requirements challenged by the producers require the disclosure of all bids after they have been considered. Each film is different, and the availability of information about prior bids does not stabilize prices. Even in subsequent rounds of bidding for the same film, if that should become necessary, the competition among the exhibitors makes price stabilization unlikely. Misuse of price information and collusion among exhibitors is not sanctioned by the Act, and as the District Court points out, such conduct would, of course, be subject to the strictures of the antitrust laws. 496 F.Supp. at 449-450.

## IV. THE VALIDITY OF THE PROHIBITION OF ADVANCE AND GUARANTEED PAYMENTS

The statutory pricing prohibition aimed at advance and guaranteed payments stands on less solid ground than the trade screening requirement and the bidding guidelines. The trade screening and bidding provisions foster disclosure of information and fair bidding procedures. Making more information available in the marketplace and increasing the regularity and orderliness of the bidding process leads presumably to more intelligent decision making. The orderly flow of accurate information tends to restrain misleading, fraudulent or otherwise unfair trade practices. The same reasoning does not support the pricing provisions.

Copyright Act, and (3) with the purposes of copyright law as embodied in copyright clause,

Art. I, § 8.

Outlawing advance and guaranteed payments when box office receipts are used as a measure of payment appears to be simply a restriction on price. So far as we can tell from the present record, it rests solely on a perceived imbalance in bargaining power between distributors and exhibitors. Judge Duncan found that "primarily the guarantee is ... a risk shifting device." 496 F.Supp. at 418. He did not identify any other state interest which supports these provisions. We understand this to mean that the statutory purpose is to increase the economic leverage of the exhibitors in order to redress a bargaining imbalance, or in other words, to increase the profits, or reduce the losses, of the exhibitors—who are local—at the expense of the distributors— who are from out of state. Judge Duncan found this state interest sufficient under the commerce clause, in part under the authority of *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), a case upholding as a legitimate state interest under the *due process clause* an effort to redress the balance of bargaining power of automobile dealers vis-a-vis the manufacturers.

The commerce clause analysis in *Baldwin v. Seelig, Inc.*, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935), appears to be more to the point for purposes of this case. There the Supreme Court was faced with similar pricing regulation of the milk industry in New England. In order to protect the economic welfare of its dairymen, New York enacted a "system of minimum prices to be paid by dealers to producers," both in-state and out-of-state. The New York statute was drafted in such a way as to be neutral and nondiscriminatory on its face, just as is the Ohio statute, although the purpose of both was to help local interests. On the face of the two statutes, neither class involved (milk producers in *Seelig*, movie producers in the instant case) are treated differently depending on whether they are in or out of state.

In *Seelig*, a dealer paid less than the minimum price for milk to his Vermont producers. Justice Cardozo for a unani-

mous court first recognized the validity of the state's interest in the welfare of dairymen under the due process clause under the doctrine of *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934). *See Seelig*, 294 U.S. at 519, 55 S.Ct. at 498. Nevertheless, the Court held the pricing system invalid under the commerce clause:

> New York asserts her power to outlaw milk so introduced by prohibiting its sale thereafter if the price that has been paid for it to the farmers of Vermont is less than would be owing in like circumstances to farmers in New York.... Such a power, if exerted, will set a barrier to traffic between one state and another as effective as if custom duties, equal to the price differential, had been laid upon the thing transported.... Impost and duties upon interstate commerce are placed beyond the power of the state, without the mention of an exception, by the provision committing commerce of that order to the power of the Congress.

294 U.S. 521–22, 55 S.Ct. at 499–500.

The Court in *Seelig* acknowledged that the state could regulate interstate milk for health and safety reasons and to prevent "fraudulent substitution" or other "deceptive" practices. But "price security," the Court said, is not a state interest under the commerce clause equivalent to "sanitary security." *Id.* at 523, 55 S.Ct. at 500. Making "its inhabitants healthy," Justice Cardozo wrote, is different from making "them rich." *Id.* The Court concluded:

> [C]ommerce between the states is burdened unduly when one state regulates by indirection the prices to be paid to producers in another, in the faith that augmentation of prices will lift up the level of economic welfare....

*Id.* at 524, 55 S.Ct. at 500.

The principle of *Seelig* appears to be that our competitive national economy is an equilibrium system of production and consumption, supply and demand, based on price; and in the absence of a strong justification, interference by the states in the pricing system to shift the balance of eco-

nomic power to producers or dealers, farmers or processors, distributors or exhibitors cannot be permitted when it burdens the flow of interstate commerce. In the instant case we have been presented with no claim or finding of collusion, monopoly power, predatory pricing of similar justification—other than the economic welfare of exhibitors—for a restriction on pricing.

*Parker v. Brown,* 317 U.S. 341, 364, 63 S.Ct. 307, 320, 87 L.Ed. 315 (1943) and *Exxon Corp. v. Governor of Md.,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) do not support a different analysis under the commerce clause. Although it is true that in *Parker* the California statute placed severe restrictions on the pricing of raisins, the Court found "significant" under the commerce clause the fact that "the national government has contributed to these efforts either by its establishment of marketing programs pursuant to act of Congress or by aiding programs sponsored by the state." 317 U.S. at 365, 63 S.Ct. at 320. The negative aspect of the commerce clause does not come into play as a bar when Congress has affirmatively acted to authorize or approve the state conduct in question. In *Exxon* the Maryland statute preventing vertical integration of certain aspects of the gasoline business did not attempt to interfere or restrict price in the marketplace, and the purpose of the statute was not to redress an imbalance in bargaining power.

██ Thus we conclude that a state's interest in righting a bargaining imbalance, standing alone, is not sufficient under the commerce clause to permit direct interference with pricing where it burdens interstate commerce. We remand the case to the District Court for further consideration and fact finding under the test established in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) respecting the "extent of the burden" on interstate commerce and the question

whether any other "legitimate local public interest" is present to support the pricing provisions of the statute under the commerce clause. The test established in *Pike v. Bruce Church, supra,* is as follows:

> Where the [challenged state] statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v. Detroit,* 362 U.S. 440, 443. [80 S.Ct. 813, 815, 4 L.Ed.2d 852]. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved and on whether it could be promoted as well with a lesser impact on interstate activities.

397 U.S. at 142, 90 S.Ct. at 847.

██ In view of our analysis, the best course to follow is to remand this aspect of the case to the District Court for further consideration. We cannot be sure on the basis of the present record whether there are other, as yet unidentified, state interests which support the pricing restriction; and we do not find in the record evidence that would allow us to assess with confidence the nature and "extent of the burden" imposed by the pricing restrictions.

### V.

Accordingly, the Court concludes that the judgment of the District Court should be affirmed except for its ruling on subsections (B) and (C) of Section 1333.06 of the Ohio statute. We remand the case to the District Court for further consideration of the validity of these two subsections in accordance with the analysis set out in this opinion.[5]

5. The plaintiffs brought this action for declaratory and injunctive relief against Governor Rhodes of Ohio. In a cross-appeal the Governor renews his contention that he is immune from suit under the eleventh amendment. As the District Court noted in its thorough study of the issue, 473 F.Supp. 560, 556–570; 496 F.Supp. 408, 429–27, the question whether the Governor has exceeded the scope of the eleventh amendment immunity accorded to state officials is controlled by *Ex Parte Young,* 209 U.S. 123, 159–60, 28 S.Ct. 441, 453–454, 52

L.Ed. 714 (1908). *Young* requires that the state officer sued have "some connection" with the enforcement of the allegedly unconstitutional Act. Even in the absence of specific state enforcement provisions, the substantial public interest in enforcing the trade practices legislation involved here places a significant obligation upon the Governor to use his general authority to see that state laws are enforced, see Ohio Constit. Art. III, § 6; Ohio Rev.Code Ann. § 2733.02 (Page 1981) (concerning equitable actions against corporations violating state laws). We thus find that the Governor has sufficient connection with the enforcement of the Act that he falls outside the scope of elev-

enth amendment protection and may be sued for the declaratory and injunctive relief requested here. Were this action unavailable to the plaintiffs, they would be unable to vindicate the alleged infringement of their constitutional rights without first violating an Ohio statute requiring a significant change in their business conduct. Such a result is clearly what the doctrine in *Ex Parte Young* was in part designed to avoid.