683 F.2d 808
 216 U.S.P.Q. 184, 1982 Copr.L.Dec. P 25,436
 ASSOCIATED FILM DISTRIBUTION CORPORATION, Avco Embassy
Pictures Corp., Buena Vista Distribution Co., Inc., Columbia
Pictures Industries, Inc., Filmways Pictures, Inc., Metro
Goldwyn-Mayer, Inc., Paramount Pictures Corporation,
Twentieth Century-Fox Film Corporation, United Artists
Corporation, Universal Pictures Division of Universal City
Studios, Inc., Universal Film Exchanges, Warner Bros. Inc.,
Warner Bros. Distributing Corporation, Appellees,
v.
The Honorable Dick THORNBURGH, Governor of the Commonwealth
of Pennsylvania, Individually and in his official capacity,
Bartle, Harvey, III, Attorney General for the Commonwealth
of Pennsylvania, individually and in his official capacity,
Budco Theatres, Inc., Budco Quality Theatres, Inc., its
subsidiary corporation, Fox Theatres Management Corporation,
The Governor and the Attorney General of the Commonwealth of
Pennsylvania, Appellants in No. 81-2706.
Appeal of BUDCO QUALITY THEATRES, INC., in No. 81-2707.
Appeal of FOX THEATRES MANAGEMENT CORPORATION, in No. 81-2708.
 Nos. 81-2706 to 81-2708.
 United States Court of Appeals,
Third Circuit.
 Argued May 14, 1982.
Decided July 20, 1982.
 
 Gregg H. S. Golden (argued), Deputy Atty. Gen., Leroy S. Zimmerman, Atty. Gen., Allen C. Warshaw, Deputy Atty. Gen., Harrisburg, Pa., Chief, Special Litigation Section, for the Governor and Attorney General of the Commonwealth of Pennsylvania.
 H. Donald Busch (argued), Lewis A. Grafman, Shelley R. Goldfarb, Philadelphia, Pa. (Harry Norman Ball, Busch & Schramm, Philadelphia, Pa., of counsel), for Budco Quality Theatres, Inc.
 Peter M. Fishbein (argued), Richard M. Squire, Manya L. Kamerling, Karen E. Katzman, Philadelphia, Pa. (Cohen, Shapiro, Polisher, Shiekman & Cohen, Kaye, Scholer, Fierman, Hays & Handler, New York City, of counsel), for Fox Theatres.
 Bernard G. Segal (argued), Bancroft D. Haviland, James D. Crawford, Carole E. Handler, George P. Williams, III, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., (Barbara Scott, William Nix, New York City, of counsel), for appellees.
 Before GIBBONS, and HUNTER, Circuit Judges, and GERRY,* District Judge.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge.
 
 
 1
 Plaintiffs in this case are movie distributors and producers. They filed suit against Pennsylvania's governor and several movie exhibitors seeking a declaratory judgment that the Pennsylvania Feature Motion Picture Fair Business Practices Law, 73 P.S. §§ 203-1 through 203-11, was unconstitutional. The trial court granted summary judgment for plaintiffs, striking down the entire statute as violative of the First and Fourteenth Amendments and the pre-emption provision of the Copyright Act, 17 U.S.C. § 301.[1] For the reasons which follow, we will reverse the grant of summary judgment and remand this case to the district court, 520 F.Supp. 971.
 
 Background
 
 2
 In 1980, Pennsylvania enacted the Feature Motion Picture Fair Business Practices Law ("Pennsylvania Act").[2] The Act forbids all blind bidding, some guarantees, all advances, all "five o'clock looks,"[3] and exclusive first runs which last longer than 42 days. Motion pictures contain protected speech. However, the Pennsylvania Act does not directly affect speech or content; rather, the Act is an economic statute designed to regulate motion pictures as commodities.
 
 
 3
 Ohio has enacted a similar statutory scheme, R.C. §§ 1333.05 through .07, the constitutionality of which was upheld after eight weeks of discovery and a four week trial. Allied Artists Pictures Corp. v. Rhodes, 496 F.Supp. 408 (S.D.Ohio, 1980), aff'd in relevant part and remanded on commerce clause issue, 679 F.2d 656 (6th Cir. June 4, 1982).[4] The Ohio statutory scheme, unlike the Pennsylvania scheme, allows advances within fourteen days of the first exhibition of a movie, forbids conditioning a license on guarantees, and contains no provision regulating the length of first runs.[5]
 
 Discussion
 The First and Fourteenth Amendments
 
 4
 The trial court ruled that the Pennsylvania Act was unconstitutional as violative of the First and Fourteenth Amendment because the Act, on its face, "creates the risk of a delay in licensing and of shifting financial burdens and uncertainties (from the exhibitors to the distributors)." 520 F.Supp. at 983.[6] We disagree. On its face, the Act does nothing but forbid certain trade practices. Whether the Act in fact creates any material risk of delay in exhibition or in fact threatens to inhibit the production of motion pictures by changing the financial structure of the industry were hotly contested questions of fact: defendants argued that, in fact, the statute has no impact on any First Amendment freedoms at all, or, in the alternative, that any impact is minimal and more than justified by the need to restore some economic power balance between the exhibitors and the distributors/producers.[7]
 
 
 5
 The Ohio district court established the following framework for its First Amendment analysis of the Ohio statute:
 
 
 6
 There is no question that motion pictures are a form of expression falling within First Amendment protection. Interstate Circuit v. Dallas, 390 U.S. 676, 682 (88 S.Ct. 1298, 1302, 20 L.Ed.2d 225) (1968); United States v. Paramount Pictures, Inc., 334 U.S. 131, 166 (68 S.Ct. 915, 933, 92 L.Ed. 1260) (1948). Even assuming that the Ohio statutes encroach upon that expression, however, that fact does not end the inquiry.
 
 
 7
 ... (In) Konigsberg v. State Bar of California, 366 U.S. 36, 49 (81 S.Ct. 997, 1005, 6 L.Ed.2d 105) (1961), ... the Supreme Court (stated) ...:
 
 
 8
 (G)eneral regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise, have not been regarded as the type of law the First or Fourteenth Amendment forbade Congress or the States to pass, when they have been found justified by subordinating valid governmental interests, a prerequisite to constitutionality which has necessarily involved a weighing of the governmental interest involved.
 
 
 9
 Id. at 50-51 (81 S.Ct. at 1006-07)....
 
 
 10
 The Act (is not directed at the content of expression). It is trade practice legislation, directed at the motion picture industry as opposed to other industries, not because that industry communicates ideas, but rather because, as plaintiffs readily acknowledge, the market structure of that industry is unique.
 
 
 11
 The Ohio Act is clearly content-neutral. It is an economic regulation operating on all distributors and exhibitors acting within Ohio regardless of the content or subject matter of the films involved. To the extent that it affects expression, it does so only incidentally.
 
 
 12
 As such the Act falls within that category of "general regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise," which should be upheld when "justified by subordinating valid governmental interests." Konigsberg, supra, 366 U.S. at 50-51, 81 S.Ct. at 1006-07....
 
 
 13
 Determination of the constitutionality of such legislation necessarily entails a balancing of the legitimate governmental interests it serves against its impact on the protected expression.
 
 
 14
 In United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), rehearing denied, 393 U.S. 900, 89 S.Ct. 63, 21 L.Ed.2d 188, the court elaborated on the balancing test:
 
 
 15
 (A) government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.
 
 
 16
 496 F.Supp. at 432-33 (footnotes omitted).[8] We agree with the Ohio district court and with the Sixth Circuit, see 679 F.2d at 661, 663, that this framework embodies the correct approach to statutes like the Pennsylvania Act. However, the grant of summary judgment in this case precluded the application of this framework. The trial court could not evaluate the actual impact of the Act (if any) on First Amendment values;[9] could not assess the nature and weight of the state concerns which led to the Act's enactment; and could not balance the state concerns against the threat (if any) to the First Amendment.[10]
 
 The Copyright Act
 
 17
 In addition to striking the Pennsylvania Act as unconstitutional under the First Amendment, the trial court ruled that the Act was pre-empted by the federal Copyright Act and therefore unconstitutional under the Supremacy Clause:
 
 
 18
 The Act's limit upon the duration of the license, upon when a distributor may license, its prohibition of guarantees and advances, and its bar against licensing or negotiations prior to screening, as well as consummating a license without complying with rebidding requirements, all directly-and severely-restrict the rights of the licensor.
 
 
 19
 520 F.Supp. at 995. We disagree with the trial court's analysis.
 
 Title 17 U.S.C. § 301(a) provides:
 
 20
 On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 ... are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.
 
 
 21
 Section 106 of the Copyright Act confers exclusive rights on the copyright holder to the following:
 
 
 22
 (1) to reproduce the copyrighted work in copies or phonorecords;
 
 
 23
 (2) to prepare derivative works based upon the copyrighted work;
 
 
 24
 (3) to distribute copies of phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
 
 
 25
 (4) in the case of ... motion pictures ..., to perform the copyrighted work publicly; and
 
 
 26
 (5) in the case of ... individual images of a motion picture ... to display the copyrighted work publicly.
 
 
 27
 The trial court stated that the issue before it was
 
 
 28
 whether the Pennsylvania Act's broad and comprehensive regulation of the process of licensing copyrighted motion pictures conflicts with the objectives of Congress in its enactment of the Copyright Act.
 
 
 29
 520 F.Supp. at 995-996.[11] The Ohio district court, dealing with this question, analyzed in great detail the legal contentions of pre-emption raised by plaintiffs and the actual impact of the Ohio statutory scheme on the plaintiffs' copyrights. Plaintiffs in Ohio argued that the Ohio Act's prohibitions against conditioning the licensing of films on the payment of guarantees, against negotiations after an unsuccessful bidding, and against blind bidding all were pre-empted because they frustrated the Copyright Act's protections by depriving the copyright's owner of the right to dispose of its subject matter on the optimum terms. The Ohio court rejected this argument. The court noted that the Copyright Act, enacted pursuant to Article I, § 8 of the United States Constitution, was "based on 'the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors.' (Citation omitted)." 496 F.Supp. at 446. The court further noted that " '(t)he copyright law, like the patent statutes, make reward to the owner a secondary consideration.' United States v. Paramount Pictures, Inc., 334 U.S. 131, 158 (68 S.Ct. 915, 929, 92 L.Ed. 1260) (1948)." Id. at 446. The court continued:
 
 
 30
 The Supreme Court has rejected the notion that because "a copyright is property derived from a grant by the United States," it is not subject to state regulation of the manner in which its product is marketed. Fox Film Corp. v. Doyal, 286 U.S. 123, 128 (52 S.Ct. 546, 547, 76 L.Ed. 1010) (1932). Further, the Supreme Court has rejected claims that the exclusive right granted by Congress to distribute copyrighted material included the exclusive right to distribute it in the manner deemed most desirable by the copyright holder. Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941).
 
 
 31
 In Fox Film, supra, the Supreme Court upheld a state's direct taking by imposition of a tax, of royalties derived from federal copyrights. Scarcely a more blatant, effective method of reducing the author's award can be imagined. Yet the Court stated:
 
 
 32
 The statute confers upon the author after publication the exclusive right for a limited period to multiply and vend copies and to engage in the other activities described by the statute in relation to the subject matter, U.S.C., Tit. 17. In creating this right, the Congress did not reserve to the United States any interest in the production itself, or in the copyright, or in the profits that may be derived from its use. Nor did the Congress provide that the right, or the gains from its exercise, would be free of tax. The owner of the copyright, if he pleases, may refrain from vending or licensing and content himself with simply exercising the right to exclude others from using his property. The sole interest of the United States and the primary object in conferring the monopoly lie in the general benefits derived by the public from the labors of authors.
 
 
 33
 ... The nature and purpose of copyrights place them in a distinct category and we are unable to find any basis for the supposition that a nondiscriminatory tax on royalties hampers in the slightest degree the execution of the policy of the copyright statute.
 
 
 34
 Fox Film, supra, 286 U.S. at 127, 131, 52 S.Ct. at 548 (citations omitted).
 
 
 35
 The authority of the states to regulate market practices dealing with copyrighted subject matter is well-established. Thus, for example, the Supreme Court has made it clear that the existence of a copyright does not permit its owner to contract concerning it in ways that suppress competition in violation of federal antitrust laws. 15 U.S.C. § 1, et seq. Interstate Circuit v. United States, 306 U.S. 208, 230, 59 S.Ct. 467, 476, 83 L.Ed. 610 (1939). Similarly, ownership of a copyright does not entitle a company to abuse the market power it obtains thereby by engaging in a per se illegal tying arrangement, see, e.g., United States v. Paramount Pictures, Inc., 334 U.S. 131, 156-57, 68 S.Ct. 915, 929, 92 L.Ed. 1260 (1948), price fixing, see, e.g., Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941), or other fraudulent or deceptive practices, cf. Mariniello v. Shell Oil Co., 511 F.2d 853 (3d Cir. 1975); Hearing Aid Ass'n of Kentucky, Inc. v. Bullock, 413 F.Supp. 1032 (E.D.Ky.1976).
 
 
 36
 The State of Ohio is no more interfering with the legitimate rights of owners of copyrighted motion pictures by regulating the ways in which plaintiffs and other producer-distributors license their product in order to achieve fair and open bargaining than were the states in passing the legislation upheld in those cases.
 
 
 37
 496 F.Supp. at 446-47. The Sixth Circuit, in affirming the trial court on the Copyright Act challenge, stated:
 
 
 38
 we do not find authority for the argument that state trade regulation which affects distribution procedures and, indirectly, monetary returns from copyrighted property is invalidated implicitly or explicitly by the terms of the Copyright Act ... or the copyright clause (of the United States Constitution). After thorough analysis, Judge Duncan rejected each of these claims, 496 F.Supp. at 441-48. We agree with his decision and his analysis.
 
 
 39
 Allied Artists, 679 F.2d at 662-663.
 
 
 40
 The trial court in this case ruled that the Pennsylvania Act, on its face, is pre-empted by the Copyright Act because it limits the exercise of federally created rights and therefore " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' Hines v. Davidowitz, 312 U.S. 52, 67 (61 S.Ct. 399, 404, 85 L.Ed. 581) (1941)." 520 F.Supp. at 996. Specifically, the trial court ruled that the Pennsylvania Act's prohibitions against advances, against guarantees in combination with percentage payments, against blind bidding, against private negotiations for licenses where all bids are rejected, and against first runs of more than 42 days were all pre-empted by the Copyright Act. 520 F.Supp. at 994-95.
 
 
 41
 It was incorrect to reach this conclusion on summary judgment. Whether the prohibitions contained in the Pennsylvania Act in fact "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" was in dispute. The Act on its face contains no threat to the copyrights themselves: the Act does not take away from plaintiffs and give to another the right to reproduce the film, to prepare derivative works based on the film, to distribute the film, or to license its performance. With regard to the question of whether the Pennsylvania Act unconstitutionally prevents or interferes with the goals of the Copyright Act, defendants contend that as a matter of fact the Pennsylvania Act has little or no impact upon the exercise of any federally created rights. The question of whether and to what extent the Pennsylvania Act interferes with attaining the "purposes and objectives of Congress" is one which must be resolved before the trial court can decide, as a matter of law, whether the interference (if any) is such as to require invalidation of all or part of the Pennsylvania Act on pre-emption grounds.[12] Thus, while we agree with the framework of analysis set forth by the Ohio district court and adopted by the Sixth Circuit, we cannot apply that framework in a summary judgment context, because the parties do not agree on whether the Pennsylvania Act in fact precludes the "accomplishment and execution of the full purposes and objectives" of the Copyright Act.
 
 
 42
 For the foregoing reasons, we will reverse the trial court's grant of summary judgment and remand this case for trial.
 
 
 
 *
 Honorable John F. Gerry, United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 The trial court entered a final judgment under Federal Rule of Civil Procedure 54(b) on the constitutionality of the statute, leaving all other issues, including Budco's antitrust counterclaims, unresolved
 
 
 [2]
 The Pennsylvania Act includes the following provisions:
 § 203-2. Legislative findings and purposes
 The General Assembly of the Commonwealth of Pennsylvania finds and declares that the licensing and distribution of feature motion pictures to theatres in this Commonwealth, including the rights and obligations of distributors and exhibitors, vitally affects the general economy as well as the access of the public to works of artistic expression and opinion. In order to promote the public interest and public welfare of this Commonwealth to:
 (1) insure unabridged access for the public to artistic expression and opinion in feature motion pictures at reasonable prices and at many different locations;
 (2) avoid undue control of the exhibitors by the distributors;
 (3) foster vigorous and healthy competition in offering feature motion pictures for the benefit of the public by prohibiting practices through which fair and honest competition is restrained, destroyed or inhibited;
 (4) promote the wide geographical dissemination at reasonable prices to the public of ideas, opinions and artistic expression in feature motion pictures;
 (5) prevent delay in the exhibition of feature motion pictures to the public in theatres playing subsequent to the first run showing;
 (6) prevent theatres from unnecessarily going out of business, thereby resulting in reducing the number of small independent businesses and unemployment with loss of tax revenues and other undesirable consequences;
 (7) prevent unfair and deceptive acts or practices and unreasonable restraints of trade in the business of distribution and exhibition of feature motion pictures within the Commonwealth;
 (8) promote fair and effective competition in that business;
 (9) benefit the movie going public by limiting the long and extensive first runs so that additional theatres, in a given area, may also exhibit the same feature motion picture and at possibly a lower admission price; and
 (10) prohibit blind bidding by insuring that exhibitors have the opportunity to view a motion picture and know its contents before committing themselves to exhibit it in their communities;
 it is necessary to legislate regulations and standards pursuant to the exercise of the police power of this Commonwealth governing the relationship between feature motion picture distributors or licensors and exhibitors serving the public by establishing fair business practice procedures for the licensing and distribution of feature motion pictures within the Commonwealth and to provide remedies for the violation of this act, including damages and attorneys' fees.
 § 203-3. Definitions
 The following words and phrases when used in this act shall have the meanings given to them in this section unless the context clearly indicates otherwise:
 "Bid." A written or oral proposal by an exhibitor to a distributor, which proposal is in response to an invitation to bid or negotiate and states the terms under which the exhibitor will agree to exhibit a feature motion picture.
 "Blind bidding." Bidding, negotiating, offering terms, accepting a bid or agreeing to terms for the purpose of entering into a license agreement prior to a trade screening of the feature motion picture that is the subject to the agreement.
 "Distributor." Any person engaged in the business of renting, selling or licensing feature motion pictures to exhibitors.
 "Exhibit or exhibition." Showing feature motion pictures to the public for a charge.
 "Exhibitor." Any person engaged in the business of operating one or more theatres in this Commonwealth.
 "Invitation to bid." A written or oral solicitation or invitation by a distributor to one or more exhibitors to bid or negotiate for the right to exhibit a feature motion picture.
 "License agreement." Any contract, agreement, understanding or condition between a distributor and an exhibitor for the exhibition of a feature motion picture by the exhibitor.
 "Person." One or more individuals, partnerships, associations, societies, trusts or corporations.
 "Run." The continuous exhibition of a feature motion picture in a defined geographical area for a specified period of time. A "first run" is the first exhibition of a feature motion picture in the designated area; a "second run" is the second exhibition and "subsequent runs" are subsequent exhibitions after the second run. "Exclusive run" is any run limited to a single theatre in a defined geographical area and a "nonexclusive" or "multiple run" is any run in more than one theatre in a defined geographical area.
 "Theatre." Any establishment in which feature motion pictures are exhibited regularly to the public for a charge.
 "Trade screening." The showing of a feature motion picture by a distributor in recognized exchange cities within the Commonwealth which is open to any exhibitor.
 § 203-4. Blind Bidding
 Blind bidding is hereby prohibited within the Commonwealth. No negotiations between exhibitors and distributors for the licensing or exhibition of a feature motion picture shall take place and no license agreement or any of its terms shall be agreed to for the exhibition of any feature motion picture within the Commonwealth before the feature motion picture has been trade screened within the Commonwealth.
 § 203-5. Guarantees
 (a) Minimum payment to distributor.-It shall be unlawful for any license agreement which provides for a fee or other payment to the distributor based in whole or in part on the attendance or the box office receipts at a theatre within the Commonwealth to contain or be conditioned upon a guarantee of a minimum payment to the distributor.
 (b) Prohibited guarantees void.-Any provision, agreement or understanding which provides for such a guarantee shall be void and purported waiver of the prohibition in subsection (a) shall be void and unenforceable.
 § 203-6. Advances
 (a) Advances prohibited.-It shall be unlawful for any license agreement for the exhibition of a feature motion picture at a theatre within the Commonwealth to contain or be conditioned upon a provision, agreement or understanding that the exhibitor shall advance any funds prior to the exhibition of the picture as security for the performance of the license agreement or to be applied to payments under such an agreement.
 (b) Prohibited advances void.-Any provision, agreement or understanding which provides for such an advance shall be void and any purported waiver of the prohibition in subsection (a) shall be void and unenforceable.
 § 203-7. Length of run
 No license agreement shall be entered into between distributor and exhibitor to grant an exclusive first run or an exclusive multiple first run for more than 42 days without provision to expand the run to second run or subsequent run theatres within the geographical area and license agreements and prints of said feature motion picture shall be made available by the distributor to those subsequent run theatres that would normally be served on subsequent run availability.
 § 203-8. Bidding procedures
 (a) Invitation to bid contents.-If bids are solicited from exhibitors for the licensing of a feature motion picture within the Commonwealth, then the invitation to bid shall specify the following:
 (1) Whether the run for which the bid is being solicited is a first, second or subsequent run; whether the run is an exclusive or non-exclusive run; and the geographical area for the run.
 (2) The names of all exhibitors who are being solicited.
 (3) The date and hour the invitation to bid expires.
 (4) The time, date, name and address of the location where the bids will be opened, which location shall be in the exchange centers of this Commonwealth.
 (b) Trading screening.-If the motion picture that is the subject of a bid has not already been trade screened within the exchange centers in this Commonwealth, the distributor soliciting the bid shall include in the invitation to bid, the date, time and location of the trade screening for such picture.
 (c) Bid submission and opening.-All bids shall be submitted in writing and shall be opened at the same time and in the presence of those exhibitors, or their agents, who submitted bids and are present at such time.
 (d) Examination of bids.-Any exhibitor, or the agent of an exhibitor, who submits a bid for a particular run of a feature motion picture may, at reasonable times within 60 days after a bid is opened, examine any bid that is made for the same run of the motion picture by another exhibitor. The exhibitor may examine the bids even if the distributor rejects all bids that are submitted. Within seven business days after a bid for a particular run of a feature motion picture is accepted, the distributor shall notify in writing each exhibitor who submitted a bid for that run, the terms of the accepted bid and the identity of the successful bidder.
 (e) Rejection of all bids.-If a distributor issues invitations to bid for a feature motion picture and rejects all bids received, he shall not enter into a license agreement for the exhibition of the picture except by means of the bidding process specified in this section. If the distributor rejects all bids submitted pursuant to the invitation to bid, he shall notify all exhibitors who submitted bids that he rejected all bids and shall issue a new invitation to bid.
 
 
 [3]
 A "five o'clock look" occurs when a distributor allows a favored exhibitor to see other bids, so that the exhibitor may re-bid. 496 F.Supp. at 430
 
 
 [4]
 The Ohio statute is quoted in 496 F.Supp. at 419-420
 Several other states have similar statutes. It appears that Pennsylvania's is the only such statute which has not survived constitutional challenge. See Allied Artists, 679 F.2d at 659 n. 2.
 
 
 [5]
 If the assertion of the exhibitor defendants that advances are often required "against license fees to become due far in the future," appendix at 333, is true, then the fact that the Ohio statute allows advances two weeks before the first showing would not be a material difference between the two statutory schemes
 
 
 [6]
 The trial court reached only the First Amendment and Copyright Act issues
 
 
 [7]
 The Ohio district court described the nature of the motion picture industry in some detail. 496 F.Supp. at 414-415
 
 
 [8]
 Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), relied on below, 520 F.Supp. at 980, 982, 985, is distinguishable from this case. In Schaumburg, a statute forbade door to door solicitation by groups which used less than 75% of the proceeds for the group's charitable purposes. Id. at 634, 100 S.Ct. at 834-35. Unlike the statute at issue in this case, the statute in Schaumburg was on its face a "direct and substantial limitation on protected activity." Id. at 636, 100 S.Ct. at 836. Here, the statute has no facial impact upon speech and does not directly regulate speech or content at all
 Schad v. Mount Ephraim, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), also cited by the trial court, involved an ordinance which forbade all live entertainment and thus constituted a "substantial restriction of protected activity." 452 U.S. at 72, 101 S.Ct. at 2184. Its adverse impact on "communicative activity" was direct and unjustifiable. Id. at 71-72, 101 S.Ct. at 2184-85.
 The state actions challenged in Consolidated Edison Co. v. Public Service Commission, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980), and in In re RMJ, --- U.S. ----, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982), involved direct regulation of content. In Consolidated Edison, defendant had forbade "the inclusion in monthly electric bills of inserts discussing controversial issues of public policy." 447 U.S. at 532, 100 S.Ct. at 2330. The Supreme Court construed this as a "content-based regulation," id. at 537, 100 S.Ct. at 2333, and as a regulation of "speech on the basis of its subject matter." Id. at 536, 100 S.Ct. at 2332. Thus, the Court noted, "the state action may be sustained only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest." Id. at 540, 100 S.Ct. at 2334. In RMJ, the state had restricted lawyer advertising "to certain categories of information," thereby prohibiting certain speech altogether. --- U.S. at ----, ----, 102 S.Ct. at 932, 939. See also Metromedia, Inc. v. San Diego, 453 U.S. 490, 516, 101 S.Ct. 2882, 2897, 69 L.Ed.2d 800 (1981) (content-based restriction on billboards invalid under First Amendment) (plurality); Linmark Associates, Inc. v. Willingboro, 431 U.S. 85, 94, 97 S.Ct. 1614, 1619, 52 L.Ed.2d 155 (1977) (law restricting signs "based on their content" ruled invalid under First Amendment).
 In Heffron v. International Society for Krishna Consciousness, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), the Court upheld a state rule which required that exhibitors at the Minnesota State Fair conduct sales, distribution and fund solicitation operations from a booth. Id. at 644, 101 S.Ct. at 2562. The Court decided that the state rule, which it construed to be a non-content-based time, place and manner restriction on speech, was not based on content and was valid under the facts before it.
 Unlike the state rules challenged in Schaumburg, Schad, Consolidated Edison, RMJ, and Heffron, the statute at issue here is not a direct regulation of speech, but is rather a restriction on certain trade practices which may (or may not) have an indirect impact on speech. Whether the statute has any impact on speech and the extent (if any) of that impact are questions of fact. Whether the impact requires invalidation of the statute or parts thereof is a question of law.
 
 
 [9]
 The Ohio district court found, after trial and an exhaustive analysis of the facts, that the actual threat to First Amendment values was minimal, and consisted solely of the "risk of an occasional and minor delay in the release of a new film." 496 F.Supp. at 435. See 496 F.Supp. at 433-35 for the court's summary of the evidence relating to the First Amendment claims. Inter alia, plaintiffs' own witnesses "made it clear that the decision to finance and produce a particular film is not primarily motivated by considerations regarding its marketing." 496 F.Supp. at 434. Indeed, the court noted that the "evidence supports the inference that (plaintiffs' former practices) may discourage production and distribution of controversial films or of low-budget films with unknown artists." 496 F.Supp. at 434 n. 14
 We note that 10 of the 12 plaintiffs in this suit were 10 of the 11 plaintiffs in the Ohio suit.
 
 
 [10]
 Any argument that the Ohio statute accomplished the state's goals at too high a cost to the First Amendment faded in the face of the Ohio district court's factfinding that the only risk to the First Amendment created by the Ohio statute was a minimal risk of delay in exhibition. The Ohio district court balanced this minimal risk against the "substantial legitimate governmental interests served by the Act":
 the State's interest in readjusting the relative market strengths of exhibitors and distributors; in establishing fair and open bidding practices; protecting consumers from a rise in ticket prices; removing the opportunities for unfair dealing and as a result, inhibiting suspicion within the industry; and permitting Ohio exhibitors to exercise their independent business judgments in licensing films.
 
 
 [496]
 F.Supp. at 435. The list of reasons for the Pennsylvania Act set forth in § 203-2 of that Act includes these concerns in addition to others
 
 
 [11]
 The Ohio district court noted that "(t)he first question ... is whether the Ohio Act creates, grants or destroys any rights that are 'equivalent' to the exclusive rights of copyright set forth in 17 U.S.C. § 106." 496 F.Supp. at 443. The court continued:
 (The Ohio Act) neither creates rights equivalent to those within the scope of the federal act nor deprives copyright owners of the protections afforded by the federal copyright. The Ohio Act does not deprive motion picture copyright owners of their rights to prohibit reproduction, performance, distribution or display of their work; nor does it vest the rights to reproduction, performance, distribution or display in exhibitors or any other person. Indeed, by providing procedures for the licensing of a film, the Act recognizes sub silentio the right of the copyright owner to exhibit the motion picture and to grant an exclusive or restrictive license to others to exhibit it.
 
 
 [496]
 F.Supp. at 443. The Sixth Circuit agreed, 679 F.2d at 663
 This analysis and conclusion seem applicable to the Pennsylvania Act, at least on its face. The trial court in this case did not need to reach this question, however, because it ruled that the Copyright Act pre-empted the Pennsylvania scheme by limiting the exercise of federally created rights. 520 F.Supp. at 993.
 
 
 [12]
 The Ohio district court, after trial, ruled that the Ohio Act did not in fact interfere with the "purposes and objectives" of the Copyright Act. To the contrary, the Ohio district court found that the Ohio Act furthered Copyright Act goals: inter alia, the prohibition against blind bidding and the requirement of a trade screening protect exhibitors from being compelled to rent movies without first being able to assess their quality, and " 'the reward (to an author or artist) does not serve its public purpose if it is not related to the quality of the copyright....' (United States v. Paramount Pictures, Inc., 334 U.S. at 158, 68 S.Ct. at 929)." 496 F.Supp. at 447. Furthermore, the Ohio court found that the Ohio Act, by forbidding blind bidding and its inevitable result of requiring theaters to book movies far in advance, in fact "further(s) the wide dissemination of copyrighted works" by increasing the opportunity of "independents for the showing of their films." 496 F.Supp. at 447-48
 We note that, unlike the Ohio Act, which forbids conditioning licenses on the payment of guarantees, the Pennsylvania Act forbids all guarantees where payment to the distributor will be based on box office receipts. Further, the Pennsylvania Act forbids first runs of longer than 42 days without plans for expanding the run: the Ohio Act contains no equivalent prohibition. Thus, particularly with regard to the 42-day provision, the Pennsylvania Act may have a greater impact upon plaintiffs' copyright rights than the Ohio Act.