ASSOCIATED FILM DISTRIBUTION CORPORATION, Avco Embassy Pictures Corp., Buena Vista Distribution Co., Inc., Columbia Pictures Industries, Inc., Filmways Pictures, Inc., Metro Goldwyn-Mayer, Inc., Paramount Pictures Corporation, Twentieth Century-Fox Film Corporation, United Artists Corporation, Universal Pictures Division of Universal City Studios, Inc., Universal Film Exchanges, Warner Bros., Inc., and Warner Bros. Distributing Corporation, Appellants

v.

The Honorable Dick THORNBURGH, Governor of the Commonwealth of Pennsylvania, individually and in his official capacity, Harvey Bartle, III, Attorney General for the Commonwealth of Pennsylvania, individually and in his official capacity, Budco Theatres, Inc., Budco Quality Theatres, Inc., its subsidiary corporation, and Fox Theatres Management Corporation.

No. 85-1545.

United States Court of Appeals, Third Circuit.

Argued May 1, 1986.

Decided Sept. 12, 1986.

James D. Crawford (Argued), Carl A. Solano, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellants.

H. Donald Busch, Lewis A. Grafman, Karen A. von Dreusche (Argued), Busch, Grafman & von Dreusche, Bala Cynwyd, Pa., for appellee, Budco Quality Theatres, Inc.

Peter M. Fishbein (Argued), Karen E. Katzman, Andrew MacDonald, Kaye, Scholer, Fierman, Hays & Handler, New York City, Richard M. Squire, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for appellee, Fox Theatres Management Corp.

Before SLOVITER and STAPLETON, Circuit Judges, and MENCER, District Judge.[*]

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

This is the second time that this challenge to the Pennsylvania Feature Motion Picture Fair Business Practice Law, 73 P.S. §§ 203–1 to 203–11 (the Act), has been before this court.

The Act has five substantive provisions. First, it prohibits distributors from licensing films through "blind bidding", by requiring the distributors to hold a trade screening of any film in Pennsylvania before entering into a licensing agreement with an exhibitor. *Id.* § 203–4.

Second, the Act provides that a film licensing agreement that bases payment to the distributor on attendance or box office receipts may not also require a minimum payment or guarantee. *Id.* § 203–5. The overwhelming majority of licensing agreements are on such a percentage basis.

Third, the Act prohibits a film licensing agreement from requiring the exhibitor to advance any funds prior to the exhibition of the film. *Id.* § 203–6.

Next, the Act prohibits distributors from granting exclusive licenses for any film for more than 42 days. *Id.* § 203–7. As interpreted by the district court, this provision does not preclude negotiation of additional exclusive licenses thereafter.

* Hon. Glenn E. Mencer, United States District Court for the Western District of Pennsylvania, sitting by designation.

Finally, the Act regulates the bidding process between exhibitors and distributors by giving all exhibitors who have submitted a bid a right to be present when bids are opened; by giving exhibitors 60 days to examine all bids if they have all been rejected; by requiring distributors to notify all bidding exhibitors of the terms of the successful bids; and by requiring distributors who have rejected all bids to inform all bidders and hold new bidding. *Id.* § 203–8(a)–(e).

Earlier, a panel of this court reversed the district court's order granting summary judgment for plaintiffs. We rejected the claim of plaintiffs, who are out-of-state film distributors and producers who distribute most of the films released in the United States (the distributors), that the Act violated plaintiffs' First Amendment freedoms or was preempted by the Copyright Act on its face. *See Associated Film Distribution Corp. v. Thornburgh*, 683 F.2d 808 (3d Cir.1982). However, because we held that on summary judgment, the trial court "could not evaluate the actual impact of the Act (if any) on First Amendment values; could not assess the nature and weight of the state concerns which led to the Act's enactment; and could not balance the state concerns against the threat (if any) to the First Amendment," *id.* at 813–14 (footnotes omitted), we remanded the case to the district court. We directed it to decide, with respect to the First Amendment claim, "[w]hether the Act *in fact* creates any material risk of delay in exhibition or *in fact* threatens to inhibit the production of motion pictures by changing the financial structure of the industry." *Id.* at 812 (emphasis in original).

With respect to the claim of federal preemption by the Copyright Act, we held that, "[w]hether the prohibitions contained in the Pennsylvania Act *in fact* 'stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' was in dispute." *Id.* at 816 (emphasis in original). We ruled that the trial court should decide "whether and to what extent the Pennsylvania Act interferes with attaining the 'purposes and objectives of Congress.'" *Id.*

On remand, the district court conducted a six-week bench trial to determine the effect of the provisions of the Act that the distributors challenged. The district court then issued an extensive opinion in which it upheld the Act against each of the distributors' challenges. 614 F.Supp. 1100 (E.D. Pa.1985).

The distributors argue that the facts as found by the district court support their argument, renewed in this appeal, that the Pennsylvania Act unconstitutionally burdens First Amendment rights and is preempted by the Copyright Act. Much of their argument is foreclosed by our earlier decision in this case, although we must consider the effect on the First Amendment analysis of the intervening decision in *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983). In addition, we must consider the distributors' argument that the Act violates the Commerce Clause, which was not at issue in the prior panel decision. We turn to that argument first.

### I.

#### The Commerce Clause

The distributors argued to the district court that the Act violated the Commerce Clause both because it discriminated against interstate commerce in favor of in-state commerce and because it unduly burdened interstate commerce. *See* 614 F.Supp. at 1114. The district court rejected both of these contentions. On appeal, the distributors appear to be focusing primarily on the latter argument, claiming that the Act unconstitutionally burdens interstate commerce because it seeks to promote an illegitimate objective, and because the means chosen to remedy the problem are not those with the least impact on interstate commerce.[1]

---

1. The distributors' brief stresses that almost all of the distributors are located outside of Penn-

All parties agree that the applicable test is set forth in the Supreme Court's decision in *Pike v. Bruce Church Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970):

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* at 142, 90 S.Ct. at 847 (citation omitted). The distributors claim that the Act's purpose is to redress a bargaining imbalance between the largely out-of-state distributors and the in-state exhibitors. Such a purpose, the distributors argue, is impermissible under the Commerce Clause.

The distributors do not point to any evidence to support their assertion that the Pennsylvania legislature intended to equalize the bargaining positions of distributors and exhibitors of films when it enacted the Act. In fact, the district court found that each provision of the Act served other, concededly legitimate, state interests. For example, the court found that the trade screening requirement reduced the risk of deceptive trade practices and "encourage[d] exhibitors to license films based on the merits of the product," thus providing the public the films it wants to see. 614 F.Supp. at 1116. It found that the provision of the Act prohibiting guarantees protected small theaters from going out of business and kept a greater number of films before the public. *Id.* The court found that the ban on exclusive runs of

longer than 42 days promoted "the faster dissemination of new films in rural and suburban areas." *Id.* at 1117. Finally, the regulations of bidding promoted "honest bidding practices." *Id.* The distributors have not argued that any of these purposes are impermissible aims of legislation.

■ Even if the legislature had intended the Act to redress an inequity in bargaining power between exhibitors and distributors, the distributors have not shown that it would be unconstitutional under the Commerce Clause. The distributors rely on the Sixth Circuit's decision in *Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656 (6th Cir.1982), in which the court considered an Ohio statute similar to the Act. The court, in addressing Ohio's ban on advances and guarantees, held that "a state's interest in righting a bargaining imbalance, *standing alone*, is not sufficient under the commerce clause to permit direct interference with pricing where it burdens interstate commerce." *Id.* at 665 (emphasis added). The court remanded the case to the district court to determine whether other purposes supported the Ohio statute's contract restrictions.

Here, it is clear that other state interests support each provision of the Act. For example, the "Legislative Findings and Purposes", which precede the Act, identify ten interests the legislature sought to further, including insuring "unabridged access for the public to artistic expression and opinion in feature motion pictures at reasonable prices and at many different locations;" preventing "unfair and deceptive acts or practices and unreasonable restraints of trade in the business of distribution and exhibition of feature motion pictures;" and preventing "theatres from unnecessarily going out of business, thereby resulting in reducing the number of small independent businesses and unemployment

sylvania and that the exhibitors who are benefited are in-state. The district court found that the Act was facially neutral. We agree that under the decision in *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125–26, 98 S.Ct. 2207, 2213–14, 57 L.Ed.2d 91 (1978), there is no im-

permissible discrimination between in-state and out-of-state commerce. *Exxon* makes clear that the distinction made by the statute between distributors and exhibitors is not the type of discrimination that the Commerce Clause forbids.

with loss of tax revenues." 73 P.S. § 203–2(1), (6) & (9). Thus, even under the analysis urged on us by the distributors, the Act would not violate the Commerce Clause.

The second prong of the distributors' argument is that the purposes of the Act could be served by means with a lesser impact on interstate commerce. First, we reiterate that the *Pike v. Bruce Church* test is whether the "burden imposed ... is clearly excessive in relation to the putative local benefits." 397 U.S. at 142, 90 S.Ct. at 847. The availability of means of achieving the state interest that have a lesser impact on interstate commerce is only one consideration in the balancing process. The primary question is whether the legislation imposes undue burdens on interstate commerce.

Contrary to the distributors' assertions, the district court found that the burdens on interstate commerce were minimal. It held that the trade screening requirement had no effect on the release date of films and that costs incurred by the distributors in creating a trade screening print were insignificant. 614 F.Supp. at 1108. The prohibition on advances and guarantees was found not to have a significant impact on film rental or on the credit relationship between distributors and exhibitors. *Id.* at 1110–11. The court found that the limitation on the length of runs caused no delay in release dates and no effect on rental terms. *Id.* at 1111–12. Finally, the district court concluded that the bidding regulations had no effect on the terms accepted by the distributors to license a film. *Id.* at 1112.

In light of the state interests that the district court found advanced by the Act, these burdens are not "clearly excessive." Indeed, the burdens identified in the district court's unchallenged findings are practically nonexistent. Thus, the distributors have not established either that Pennsylvania's purposes in enacting the Act were illegitimate or that the Act's burdens outweigh its benefits. We hold, therefore, that the Act does not violate the Commerce Clause.

## II.

### *The First Amendment*

In our prior decision in this case, we held that the Act was a content neutral "general regulatory statute." *Associated Film Distribution Corp. v. Thornburgh*, 683 F.2d at 812–13. As such, we held that its constitutionality under the First Amendment was governed by the test articulated in *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968), for generally applicable regulations "when 'speech' and 'nonspeech' elements are combined in the same course of conduct." Under *O'Brien*,

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. at 377, 88 S.Ct. at 1679.

We remanded the case so that the district court could balance the burden the Act placed on First Amendment values and "the nature and weight of the state concerns which led to the Act's enactment." 683 F.2d at 813–14. On remand, the district court found that the Act "had little or no impact on First Amendment values," and that the state interests at stake were "substantial". 614 F.Supp. at 1118. The court concluded that the Act did not unconstitutionally burden First Amendment values, and, in fact, that it furthered interests protected by the First Amendment by requiring wider and more rapid distribution of films. *Id.* Thus, the court found the Act constitutional under *O'Brien*.

On appeal, the distributors do not argue that the Act is invalid under the *O'Brien* test. Rather, their argument is that the Act discriminates against an industry that engages in First Amendment activities, and, therefore, that it must meet the con-

siderably more rigorous test set forth by the Supreme Court in *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983).

In *Minneapolis Star*, the Court held that a state tax on the ink and paper consumed by periodicals, including newspapers, violated the First Amendment. The Court held that the tax discriminated against the press, and that such discriminatory taxation could not stand "unless the burden [on rights protected by the First Amendment] is necessary to achieve an overriding governmental interest." *Id.* at 582, 103 S.Ct. at 1370. According to the Court, "differential treatment [of the press], unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." *Id.* at 585, 103 S.Ct. at 1372. As an alternative ground for striking down the statute, the Court held that its exemption of the first $100,000 for ink and paper used unconstitutionally singled out large newspapers. *Id.* at 591–92, 103 S.Ct. at 1375.

The distributors contend that the Pennsylvania Act singles out the motion picture industry, whose products are accorded First Amendment protection, for the same type of discriminatory treatment that the Court found unconstitutional in *Minneapolis Star*. According to the distributors, this discriminatory regulation is not justified by a "compelling" or "overriding" interest and is not the least restrictive alternative to achieve the state interests asserted.

■ An essential factor in the *Minneapolis Star* analysis is the inference of a goal to suppress expression. In our prior opinion in this case, we found that the Pennsylvania Act was not infected by such a goal. We stated that the Act was " 'clearly content-neutral' ", " 'trade practice legislation' ", and that it was directed at the motion picture industry " 'not because that industry communicates ideas, but rather because ... the market struc-

ture of that industry is unique.' " 683 F.2d at 812 (quoting *Allied Artists Pictures Corp. v. Rhodes*, 496 F.Supp. 408, 432 (S.D. Ohio 1980), *aff'd in part, remanded in part*, 679 F.2d 656 (6th Cir.1982)). This conclusion that the Act was promoted by trade practices associated with the distribution of motion pictures forecloses the argument that the Act was designed to single out the motion picture industry in order to suppress its expressive conduct. It is only the latter type of differential treatment that triggers the "compelling interest" analysis of *Minneapolis Star*.

Moreover, even if we were free to reconsider this question, appellants have not persuaded us that the Act is discriminatory in the same sense as was the differential taxation of the press that was ruled invalid in *Minneapolis Star*. The regulation of trade practices between distributors and exhibitors does not directly impinge upon the expressive aspect of moviemaking activities, as did the state taxation of ink and paper used by the press in *Minneapolis Star*. Distribution of protected materials also falls within the ambit of the First Amendment but nothing in the language or structure of the Act suggests that the Pennsylvania legislature intended to suppress or regulate speech through regulation of certain trade practices.

The rationale of *Minneapolis Star* may require its extension beyond taxation to regulations that impose differential penalties directly on some First Amendment activity, *see, e.g., J–R Distributors, Inc. v. Eikenberry*, 725 F.2d 482, 495 (9th Cir. 1984), *rev'd. on other grounds sub nom. Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985). Certainly, some regulation may in effect control the activity regulated as effectively as would taxation. However, in this case the district court found, after a full hearing, that the Act has had little, if any, impact on the First Amendment activities of the distributors. 614 F.Supp. at 1118. These findings are not clearly erroneous. They confirm our prior opinion that the Act in reality is not a discriminatory

regulation of a First Amendment activity, but is instead, a content-neutral, regulatory statute that may have an incidental effect on some of the distributors' First Amendment activities.

Even after *Minneapolis Star,* such regulations are subject to the *O'Brien* test. *See Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 1533, 84 L.Ed.2d 547 (1985). *See also Minneapolis Star,* 460 U.S. at 585 n. 7, 103 S.Ct. at 1372 n. 7 (referring to *O'Brien* approvingly as consistent with its analysis).

The district court held that the decision in *Minneapolis Star* would not, in any event, require striking this statute because it found that "the differential treatment of the movie industry in Pennsylvania's laws is justified by the special problems of that industry." 614 F.Supp. at 1119 n. 29. *Minneapolis Star* suggested that even differential taxation of the press might be permissible if "the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential taxation." 460 U.S. at 585, 103 S.Ct. at 1372. In view of our decision that the regulation of trade practices singular to the distribution of motion pictures is not the type of differential treatment that requires application of the *Minneapolis Star* test, we need not reach the issue whether the counterbalancing state interest is of "compelling importance." We thus affirm the decision of the district court that the Act does not violate the First Amendment.

### III.

#### *The Copyright Act*

The distributors also challenge the Act on the ground that it limits rights specifically granted the copyright holder by the Copyright Act of 1976, 17 U.S.C. §§ 101–914, and interferes with the Congressional purpose underlying that statute. The distributors argue, therefore, that the Act is

preempted under the Supremacy Clause. *See* U.S. Const. art. VI, cl. 2.[2]

In particular, the distributors argue that the Act obstructs the licensing of copyrighted films by requiring trade screening, which imposes a direct control on the timing of licensing by preconditioning it on the completion of the films; by prohibiting guarantees and advances, thereby impermissibly restricting the licensor's control and freedom to license; and by prohibiting exclusive first runs of motion pictures for more than 42 days, thereby precluding copyright holders from licensing exclusively for a term of their choice.

This argument by distributors is essentially a facial challenge to the Act on the ground of preemption. Even were the argument persuasive, this panel is not free to examine the issue because it has already been decided adversely to the distributors by the prior panel decision. In that opinion, we held that the first district court decision granting summary judgment for the distributors erroneously ruled that the provisions of the Pennsylvania Act challenged by the distributors here were preempted by the Copyright Act. We stated:

> The Act on its face contains no threat to the copyrights themselves: the Act does not take away from plaintiffs and give to another the right to reproduce the film, to prepare derivative works based on the film, to distribute the film, or to license its performance.

*Associated Film Distribution Corp. v. Thornburgh,* 683 F.2d at 816. In addition, we quoted the *Allied Artists* district court opinion for the proposition that "[t]he authority of the states to regulate market practices dealing with copyrighted subject matter is well-established." *Id.* (quoting *Allied Artists,* 496 F.Supp. at 447).

Thus, the earlier decision of this court conclusively established that the Pennsylvania Act was not facially preempted by the Copyright Act. At the same time, we

---

**2.** They do not suggest that the Act is preempted under the specific provision of the Copyright Act preempting state laws that purport to grant

or destroy any rights "that are equivalent to any of the exclusive rights within the general scope of copyright." 17 U.S.C. § 301(a).

recognized that in actual operation the Act might prevent or interfere with the goals of the Copyright Act and remanded for a factual determination by the district court of the Act's actual impact on federally created rights. *Id.* at 816–17.

On remand, the district court found that the various provisions of the Act have "had no effect on the incentive to make and distribute motion pictures;" do "not dilute the distributors' ownership rights in their films;" set "no limit on the financial terms at which films may be licensed;" do "not restrict the distributors' right to license its films;" and have "not impaired distributors' ability to release their films on the dates they desire." 614 F.Supp. at 1122–23. Thus, the district court found that "[p]laintiffs have not fulfilled their burden of demonstrating that the Pennsylvania Feature Motion Picture Fair Business Practices Law has interfered with the Federal Copyright Act." *Id.* at 1122.

The distributors do not contend that the findings of the district court are clearly erroneous. Instead, they make two arguments. The first is that when we remanded for a determination as to whether the prohibitions contained in the Act *in fact* stand as an obstacle to the accomplishment and execution of the purposes and objectives of Congress, we did not discuss the direct conflicts between the rights granted a copyright holder under 17 U.S.C. § 106 and the restrictions imposed by the Act. They argue that because these restrictions are imposed not by legislation of general application but by a statute aimed solely at the copyright-protected motion picture distributors, the Act must fall on that basis alone. Brief for Appellants at page 32. We view this argument as nothing more than a reassertion by the distributors of their facial challenge which, as we have held, is not properly before us because of the prior panel decision.

The distributors' second argument is that the district court found that the Act created a sufficient burden on the rights protected by the Copyright Act to require a finding of preemption. The distributors point to the district court's findings that the prohibition on guarantees eliminated a source of income for the distributors, 614 F.Supp., at 1110; that the prohibition on advances deprives the distributors of a means of protecting against credit risks, *id.;* that the limitation on the length of exclusive runs restricts the distributors' ability to use certain marketing strategies, *id.* at 1111; and that the trade screening requirement imposes some added costs on the distributors. *Id.* at 1108.

Even if we disregard the district court's conclusion that these burdens were insignificant, these findings show, at most, that the Act may affect, to some extent, the copyright owner's right to dispose of the film on the optimum terms. However, in our prior opinion we rejected the distributors' argument that a state trade regulation that affects the copyright owner's monetary return is thereby invalidated by the Copyright Act. In that opinion we quoted approvingly from the district court and court of appeals opinions in *Allied Artists Pictures Corp. v. Rhodes*, 496 F.Supp. at 446–47 and 679 F.2d at 662–63, including the Sixth Circuit's statement that there is no "authority for the argument that state trade regulation which affects distribution procedures and, indirectly, monetary returns from copyrighted property is invalidated implicitly or explicitly by the terms of the Copyright Act." 679 F.2d at 662–63 (approvingly quoted in 683 F.2d at 816). Since the burdens to which the distributors point relate only to the maximization of income, we find that their argument in this respect is also foreclosed by our earlier opinion.

We believe, however, that the distributors' contention that the limitation on the length of exclusive runs to 42 days interferes with the copyright owner's right to license exclusively for the life of the copyright merits particular comment. The district court found this interference to be "minimal" because the court interpreted the 42-day provision of the Act as permitting a distributor to enter into a series of exclusive contracts with the same exhibitor as long as no contract lasted longer than 42 days. 614 F.Supp. at 1123–24. Although such an interpretation is advantageous to the distributors' desire to extend certain

exclusive runs beyond 42 days, the distributors dispute the district court's interpretation of the Act.

The 42–day clause provides as follows:

No license agreement shall be entered into between distributor and exhibitor to grant an exclusive first run or an exclusive multiple first run for more than 42 days without provision to expand the run to second run or subsequent run theatres within the geographical area and license agreements and prints of said feature motion picture shall be made available by the distributor to those subsequent run theatres that would normally be served on subsequent run availability.

73 P.S. § 203–7.

■ We agree with the district court that "[t]his part of the statute was inartfully drafted." 614 F.Supp. at 1111 (footnote omitted). Nonetheless, we cannot construe this provision as did the district court. Its plain language requires a distributor to make provision "to *expand* the run to second run or subsequent run theatres within the geographical area" and to make available prints of its feature films "to ... subsequent run theatres...." As the brief of exhibitor appellee Fox Theatres concedes, the Act requires that the exclusive first run must be expanded after 42 days "so that sub-run exhibitors will be able to offer to license the film and bring the picture to their communities sooner than they would have otherwise before the Act." Brief of Fox Theatres at page 12. We conclude that the district court's interpretation that "[t]he statute also does not prevent a distributor from entering into a series of exclusive licenses with one exhibitor as long as each license does not exceed 42 days," *Associated Film v. Thornburgh,* 614 F.Supp. at 1124, is erroneous as a matter of law.

There may be merit to the distributors' argument that the 42–day provision, when construed as limiting the distributors' right to license an exclusive run to 42 days, is preempted by the Copyright Act. However, such preemption would be apparent on the face of the statute and cannot be reconciled with the court's earlier decision that the Act is not facially invalid under the Copyright Act. As we have stated above, we are bound to that position.[3]

## IV.

### Conclusion

For the reasons set forth above, we will affirm the judgment of the district court.

---

**3.** The writer of this opinion believes that the 42–day clause is inconsistent with the Copyright Act. The Copyright Act gives the owner of a copyright the exclusive right to distribute copies of the copyrighted work by rental, lease, or lending. 17 U.S.C. § 106(3); *see also* M. Nimmer, *Nimmer on Copyright* § 8.11 at 8–115 (1985). That right encompasses the grant of an exclusive license for a period as long as the copyright owner desires within the term of the copyright. Nonetheless, she feels compelled to join her colleagues in affirming the district court decision because Internal Operating Procedure 8C of this court binds subsequent panels to reported panel opinions. Court in banc consideration is required to overrule a published opinion.