**ORSON, INC. d/b/a The Roxy Screening Rooms, Plaintiff,**

**v.**

**MIRAMAX FILM, CORP., Defendant.**

No. CIV. A. 93–4145.

United States District Court,
E.D. Pennsylvania.

Nov. 3, 1997.

Paul R. Rosen, Jeffrey M. Goldstein, Richard J. Perr, Spector, Gadon & Rosen, Philadelphia, PA, for Plaintiff.

Thomas E. Zemaitis, Barbara T. Sicalides, Donald J. Carney, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Defendant.

## MEMORANDUM

JOYNER, District Judge.

Presently before this Court is Defendant, Miramax Film, Corp.'s ("Miramax" or "Defendant"), post trial motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50 or in the alternative for a New Trial pursuant to Federal Rule of Civil Procedure 59. This action was commenced on August 2, 1993 by Orson, Inc. ("Orson" or "Plaintiff"). Plaintiff's second amended complaint alleged three counts: Count I alleged that Miramax violated section 1 of the Sherman Act; Count II alleged that Miramax violated Pennsylvania's "common law doctrine against unreasonable restraint of trade;" and Count III alleged that Miramax violated the Pennsylvania Feature Motion Picture Fair Business Practices Law, 73 P.S. § 203–1, et seq.[1] ("Pennsylvania Act" or "the Act"). This Court granted Miramax's Motion for Summary Judgment as to Counts I and II and granted partial summary judgment as to Count III. See Orson v. Miramax, 862 F.Supp. 1378 (1994). The Third Circuit affirmed the grant of summary judgment as to Counts I and II, but vacated and remanded on Count III. See Orson v. Miramax, 79 F.3d 1358 (1996). At trial, this Court granted Defendant, Miramax's, Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(a) on plaintiff's claims that Miramax violated sections 203–4 and 203–8 of the Pennsylvania Act. See (Trial Transcript 2/27/97, 2). A jury trial followed on the merits of plaintiff's claim that Miramax violated section 203–7 of the Pennsylvania Act. The jury found that Miramax violated section 203–7 of the Act with regard to seventeen (17) Miramax films[2] and awarded damages in the amount of $159,780 to Orson. It is from this judgment that Miramax presently seeks post trial relief. For the following reasons, Miramax's motion is denied.

1. For a more complete procedural history see Orson v. Miramax, 79 F.3d 1358, 1363–65 (3d Cir.1996).

2. The films for which the jury found violations are as follows: "Double Lives of Veronique", "High Heels"; "Hear My Song"; "Meditera-

## BACKGROUND

The facts surrounding this case have been described at length in several prior opinions of this Court, Orson, Inc. v. Miramax Film Corp., 867 F.Supp. 319 (E.D.Pa.1994), 862 F.Supp. 1378 (1994), 1994 WL 7708 (1994), 836 F.Supp. 309 (1993), and in the Third Circuit opinion, Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358 (1996). Thus, familiarity with these facts is assumed, and they are not repeated here. Rather, we summarize the statutory provisions at issue and the claims of Miramax.

Section 203–7 of the Pennsylvania Act provides that:

No license agreement shall be entered into between distributor and exhibitor to grant an exclusive first run or an exclusive multiple first run for more than 42 days without provision to expand the run to second run or subsequent run theatres within the geographical area and license agreements and prints of said feature motion picture shall be made available by the distributor to those subsequent run theatres that would normally be served on subsequent run availability.

73 P.S. § 203–7. Orson was able to sustain a claim under this provision after the Third Circuit interpreted the term "within the geographical area" to mean that there must be expansion to second run theaters within the geographic area for which the original license was granted. See Orson, 79 F.3d at 1373–74 (overruling this Court's interpretation of the term "geographic area"); see also Orson, 862 F.Supp. at 1387 (overruled in part Orson, 79 F.3d 1358) (finding that the term geographic area did not mean "increas[ing] market rivalry among direct competitors, but instead [meant] promot[ing] the wide distribution of movies throughout Pennsylvania").

Section 203–10 of the Pennsylvania Act provides a cause of action for violation of any of the statutory provisions. Section 203–10 states:

neo"; "Delicatessen"; "Zentropa"; "Enchanted April"; "Reservoir Dogs"; "The Crying Game"; "Passion Fish"; "Strictly Ballroom"; "Like Water for Chocolate"; "Ethan Frome"; "Of Human Heart"; "Farewell My Concubine"; "The Piano"; and "Snapper".

"[a]ny exhibitor may bring an action against a distributor or exhibitor or both in the respective court of common pleas wherein the exhibitor's business is located to recover damages sustained by reason of a willful and intentional violation of his [sic] act...."

73 P.S. § 203–10.

Miramax currently seeks judgment as a matter of law or a new trial claiming that the Pennsylvania Act is unconstitutional under the Supremacy Clause of the United States Constitution because it is preempted by the Copyright Act; claiming the Act is unconstitutional under the Commerce Clause of the United States Constitution because it is an undue burden on interstate commerce; claiming there was not sufficient evidence from which the jury could find that Miramax's conduct caused any injury to Orson; claiming that there was insufficient record evidence from which the plaintiff's damages expert could base his damages calculations; and claiming there was not sufficient evidence from which the jury could find that Miramax acted in a willful or intentional manner as required by section 203–10 of the Act. Further, Miramax argues that it is entitled to a new trial because this Court committed errors by admitting any evidence of Miramax' violation of section 203–4 of the Act since that provision of the statute was no longer an issue at trial; claiming that this Court erred in instructing the jury as to the articulated legislative purposes of the Act; and that this Court erred in not instructing the jury what is legally required to find a violation of section 203–7 of the Act. As stated supra, Miramax's motion will be denied.

## DISCUSSION

### I. Legal Standards for Judgment As a Matter of Law and for New Trial

A renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) should only be granted if, " 'viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability.' " *Coleman v. Kaye,* 87 F.3d 1491, 1497 (3d Cir.1996)(quoting *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1166 (3d Cir.1993)). However, a mere scintilla of evidence is not enough. *Walter v. Holiday Inns, Inc.,* 985 F.2d 1232, 1238 (3d Cir.1993). Instead, there must be sufficient "evidence upon which the jury could properly find a verdict for that party." *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1166 (3d Cir.1993) (citations omitted). In making the determination, the court "may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." *Id.*

Under Federal Rule of Civil Procedure 59, the standard for granting a new trial is if "the verdict is contrary to the great weight of the evidence or errors at trial produce a result inconsistent with substantial justice." *Sandrow v. United States,* 832 F.Supp. 918, 918 (E.D.Pa.1993) (citations omitted). A new trial should only be granted "where a miscarriage of justice would result if the verdict were to stand." *Olefins Trading, Inc. v. Han Yang Chemical Corp.,* 9 F.3d 282, 289 (3d Cir.1993).

### II. Judgment As a Matter of Law Pursuant to Rule 50

#### A. Supremacy Clause: Copyright Act

Miramax argues that it is entitled to judgment as a matter of law because, as applied, section 203–7 of the Pennsylvania Act violates the Supremacy Clause. Specifically, Defendant argues that section 203–7 infringes on rights granted copyright owners by the Copyright Act and is, therefore, preempted by the express provisions of the Act. *See* 17 U.S.C.A. §§ 106 & 301. Miramax claims that the jury's verdict compels it to "terminate a first run at one theater, such as the Ritz, after 42 days and open another run at a competing theater such as the Roxy." (Def.'s Mem. at 7–8). Miramax further argues that the jury's verdict requires it to license a film to an inferior "subsequent run" theater even if there is no request from such a "subsequent run" theater. This, according to Miramax, constitutes a compulsory license because "it is the exhibitor de-

manding the film and the Commonwealth of Pennsylvania, not Miramax, which determine how Miramax' copyrighted materials will be distributed." (Def.'s Mem. at 8). Thus, Miramax claims section 203–7 infringes on the rights granted by the Copyright Act and violates the Supremacy Clause.

Plaintiff responds that the Third Circuit decision in *Associated Film Distribution Corp. v. Thornburgh*, 800 F.2d 369 (1986) (*"Associated Film II"*) forecloses this argument. For the following reasons, we must agree.

The Copyright Act of 1976, 17 U.S.C.A. § 101 *et seq.*, gives to the owner of a copyright:

> the exclusive rights to do and to authorize any of the following:
>
> (1) to reproduce the copyrighted work in copies or phonorecords;
>
> (2) to prepare derivative works based upon the copyrighted work;
>
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
>
> (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and
>
> (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

17 U.S.C.A. § 106. Further, the Copyright Act specifically provides for preemption of any law infringing upon these rights in 17 U.S.C.A. § 301, which provides:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any

of the exclusive rights within the general scope of copyright as specified by section 106 ... are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

Miramax argues that § 301 of the Copyright Act mandates preemption in this case because the finding of the jury amounts to an infringement of Miramax's exclusive right to "distribute copies or phonorecords of the copyrighted work to the public by sale ... or by rental...." · *See* (Def.'s Mem. at 8 & 15 (quoting 17 U.S.C.A. § 106(3))).

The Court of Appeals for the Third Circuit has previously been faced with the question of whether 73 P.S. § 203–7 is preempted by the provisions of the Copyright Act of 1976 in *Associated Film Distribution Corporation v. Thornburgh*, 683 F.2d 808 (1982) (*"Associated Film I"*) and *Associated Film Distribution Corporation v. Thornburgh*, 800 F.2d 369 (1986) (*"Associated Film II"*).[3] In these decisions, the Third Circuit determined that the 42–day provision of the Act is not preempted by the Copyright Act. These decisions effectively foreclose Defendant, Miramax's, current argument.

The Third Circuit in *Associated Film I* determined that the Act was facially valid as it "does not take away from plaintiffs and give to another the right to reproduce the film, to prepare derivative works based on the film, to distribute the film, or to license its performance." 683 F.2d at 816.[4] The court then remanded the case to the district court for a determination of whether, as applied, section 203–7 had an impact on the copyrights.

On remand, the district court held that the Pennsylvania Act, as applied, did not violate the Copyright Act because the effects of the

---

**3.** In ruling on the validity of the Pennsylvania Act, the Third Circuit noted agreement with the framework of analysis set forth by the district court and adopted by the Sixth Circuit in *Allied Artists Picture Corp. v. Rhodes*. The *Allied* cases involved an Ohio statute similar to the Pennsylvania Act, except it did not include a limiting provision like the 42–day provision of the Pennsylvania Act. *See Allied Artists Pictures Corp. v. Rhodes* 496 F.Supp. 408 (1980) and *Allied Artists*

*Picture Corp. v. Rhodes* 679 F.2d 656 (6th Cir. 1982).

**4.** In a footnote, the Third Circuit suggested that "particularly with regard to the 42–day provision, the Pennsylvania Act may have a greater impact upon plaintiffs' copyright rights than the Ohio Act." *Id.* at 817 n. 12.

Act on the copyrights were minimal. The district court held that the effects of section 203–7 were minimal "because [it] interpreted the 42–day provision of the Act as permitting a distributor to enter into a series of exclusive contracts with the same exhibitor as long as no contracts lasted longer than 42 days." *Associated Film II*, 800 F.2d at 376.

On the subsequent appeal, the Third Circuit in *Associated Film II*, specifically rejected the district court's interpretation that the Act's 42–day provision would allow a series of exclusive contracts. The Third Circuit interpreted the Act's 42–day requirement to mean expansion to a different theater. *Id.* at 377.

The Third Circuit, thus, never ruled on whether the 42–day provision, as applied, violates the Copyright Act. Instead, the court conceded that "[t]here may be merit to the distributors' argument that the 42–day provision, when construed as limiting the distributors' right to license an exclusive run to 42 days, is preempted by the Copyright Act. However, such preemption would be apparent on the face of the statute and cannot be reconciled with the court's earlier decision that the Act is not facially invalid." *Id.* The court's final pronouncement was that "we are bound to that position." *Id.*

In a footnote to the *Associated Film II* decision, current Chief Judge Sloviter stated "[t]he writer of this opinion believes that the 42–day clause is inconsistent with the Copyright Act." *Id.* at n. 3. Judge Sloviter concluded that the Copyright Act grants the exclusive right to distribute copies of the works to the copyright owner and "[t]hat right encompasses the grant of an exclusive license for a period as long as the copyright owner desires within the term of the copyright." *Id.* Therefore, Judge Sloviter found

the 42–day provision to be inconsistent with the Copyright Act. However, Judge Sloviter was not at liberty to find the Pennsylvania Act unconstitutional due to Internal Operating Procedure 8C of the Third Circuit which "binds subsequent panels to reported panel opinions." *Id.*

In this case, *Orson v. Miramax*, 79 F.3d 1358, 1374 (1996), the Third Circuit has held that " § 203–7 prohibits a distributor and exhibitor from entering into a license agreement which grants an exclusive first-run for more than 42 days without providing for expansion in the same geographic area covered by the license." Therefore, Miramax is correct in stating that the jury's verdict mandates that Miramax cannot enter into an exclusive license with an exhibitor in Center City[5] for a period in excess of 42 days, without making provision to expand the film to the "second run" or "subsequent run" theater normally served on a subsequent run basis in Center City on the 43rd day. *See* 73 P.S. § 203–7. This ruling limits the ability of the copyright owner to grant an exclusive run to a 42 day maximum.[6]

Further, as stated supra, Miramax is correct that the Third Circuit has not ruled on whether section 203–7 would be inconsistent with the Copyright Act on an as applied basis.[7] However, the argument that defendant is currently making, which is that the 42–day provision of the Act is in violation of the Supremacy Clause because it limits the exclusive rights of distribution given to the copyright owner under the Copyright Act, has already been rejected by the Third Circuit. As discussed *supra*, the Third Circuit in *Associated Film II* determined that this exact defect would be "apparent on the face" of the statute, however, it has already deter-

---

5. We refer only to Center City here as that is the relevant geographic area to this case.

6. There is no merit to Miramax' claim that the statute requires them to terminate the movie at their chosen theater in order to comply with this expansion. Miramax could continue to show the film at both theaters. The alleged fact that no Center City theater will play "day and date" with another Center City theater seems to be the choice of Mr. Posel, the owner of the Ritz; it is not mandated by the statute. *See* (N.T. Direct Exam of R. Posel, 2/27/97, 88: 1–18)(stating he

would not play day and date with another center city theater); *but see* (N.T. Direct Exam of Raab, 2/24/97, 27:2—27:20) (stating he suggested to Miramax that they allow him to play the movies at the Roxy day and date with the Ritz). "Day and date" means that no theater will play the same movie on the same day as another theater.

7. *Associated Film II* rejected the district court's finding that the act was valid on an as applied basis because they rejected the premise underlying that finding.

mined that facially the statute is not inconsistent with the Copyright Act. *See Associated Film II, supra.* In thus holding, the Third Circuit has effectively foreclosed the ability to bring an as applied challenge on these bases. Therefore, this Court is, just as Chief Judge Sloviter was, bound by the Third Circuit's decision. Accordingly, Miramax's Motion for Judgment as a Matter of Law based on the Supremacy Clause and Copyright Act will be denied.

### B. Commerce Clause

Defendant, Miramax, also claims it is entitled to Judgment as a Matter of Law because section 203–7 of the Pennsylvania Act, as applied, violates the Commerce Clause of the United States Constitution. Specifically, Miramax claims that the effect of section 203–7 is to "compel distributors to move their films between theaters within the same zone," [8] which, Miramax argues, places an undue burden on interstate commerce. (Def.'s Mem. at 16). Defendant argues that this is the effect since no theater in Center City Philadelphia will play "day and date" [9] with another theater in Center City. (Def.'s Mem. at 7–8 & n. 6). Therefore, Defendant argues, if Miramax is forced to allow another theater in the Center City area to exhibit a film on the 43rd day, they are forced to withdraw the film from the current exhibitor to do so, which constitutes an undue burden on interstate commerce. (Def.'s Mem. at 17).

The Commerce Clause operates as a limitation on the power of states to regulate interstate commerce. *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). However, not "every exercise of state power with some impact on interstate commerce is invalid." *Edgar,* 457 U.S. at 640, 102 S.Ct. at 2639. The Court in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), articulated the following balancing test to determine whether a state's regulation is violative of the Commerce Clause: "where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142, 90 S.Ct. at 847.

The Commerce Clause is "aimed at legislation which sets up trade barriers blocking or burdening the free flow of commerce between the states." *Allied Artists Pictures Corp. v. Rhodes,* 496 F.Supp. 408 (S.D.Ohio 1980) *(overruled on other grounds Allied Artists Picture Corp. v. Rhodes,* 679 F.2d 656 (6th Cir.1982) (citing *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 807, 96 S.Ct. 2488, 2496, 49 L.Ed.2d 220 (1976))). However, as the Court articulated in *Exxon Corp. v. Governor of Maryland,* 437 U.S. at 127, 98 S.Ct. at 2214, "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another."

In *Associated Film Distribution Corp. v. Thornburgh,* 800 F.2d 369 (1986) *(Associated Film II),* the Third Circuit determined that the 42–day provision of the Pennsylvania Act, as applied, did not violate the Commerce Clause.[10] According to the mandates of *Pike,* the court first determined that the Act represented legitimate state interests including, but not limited to, "promot[ing] 'the faster dissemination of new films in rural and suburban areas.' " *Id.* at 372 (quoting district court opinion, *Associated Film Distribution Corp. v. Thornburgh,* 614 F.Supp. 1100, 1116 (E.D.Pa.1985)). The court also looked to the "Legislative findings and purposes" of the Act and recognized these as legitimate state interests in enacting this legislation. These include:

---

8. *See Orson v. Miramax,* 79 F.3d 1358 (3d Cir.1996)(holding that section 203–7 requires "expansion in the same geographic area covered by the initial license").

9. *See* note 6 *supra* for a discussion of the meaning of day and date.

10. The court agreed with the district court that facially the act did not violate the Commerce Clause. *Id.* at 371, n. 1. Therefore, the court analyzed the 42–day provision according to the balancing test articulated in *Pike* to determine whether, as applied, the provision violated the Commerce Clause.

'unabridged access for the public to artistic expression and opinion in feature motion pictures at reasonable prices and at many different locations;' preventing 'unfair and deceptive acts or practices and unreasonable restraints of trade in the business of distribution and exhibition of feature motion pictures;' and preventing 'theatres from unnecessarily going out of business, thereby resulting in reducing the number of small independent businesses and unemployment with loss of tax revenues.'

*Id.* at 372 (quoting 73 P.S. § 203–2(1), (6), & (9)).

The Third Circuit then addressed the balancing prong of Pike to determine whether the burden imposed by the act " 'is clearly excessive in relation to the putative benefits.' " *Id.* at 373 (quoting *Pike,* 397 U.S. at 142, 90 S.Ct. at 847). In applying the balancing test, the Third Circuit specifically upheld the district court's finding that the burdens imposed by the statute were not excessive in relation to the legitimate state interests of Pennsylvania in passing the legislation. *See Associated Film Distribution Corp. v. Thornburgh,* 614 F.Supp. 1100, 1117 (E.D.Pa. 1985) ("*Associated Film I* ").

The district court cited with approval *Allied Artists Corp. v. Rhodes,* where an Ohio district court, when faced with a Commerce Clause challenge to a similar statute, determined that "[t]he Ohio Act does not block or impede the flow of commerce between the states." 496 F.Supp. 408 (S.D.Ohio 1980). The Ohio court reasoned that "the Act has no effect whatsoever on commerce passing through Ohio destined for another state. Nor does it prevent any distributor from entering the Ohio market." *Id.* at 439. The plaintiff movie distributors in *Allied* claimed that the Act constituted an undue burden on interstate commerce because it caused "delays in the release of motion pictures, interference with plaintiffs' ability to license with the most desirable theater, and interference with the interstate marketing of motion pictures." In responding to these claims, the

Ohio court stated that "[t]he Commerce Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Id.* at 440 (quoting *Exxon,* 437 U.S. at 127–28, 98 S.Ct. at 2215). Thus, the court determined that the " 'burdens' which the plaintiffs assume under the Act are simply not burdens on the interstate market." *Id.*

In accepting this reasoning and determining that the Pennsylvania Act does not violate the Commerce Clause, the district court in *Associated Film I,* determined that even if a distributor chooses not to open a film in Pennsylvania because of the 42–day provision, that is not an adverse effect on interstate commerce. *Associated Film Distribution Corp. v. Thornburgh,* 614 F.Supp. 1100, 1117 (E.D.Pa.1985) ("*Associated Film I* "). Instead, the district court found that the choice of a distributor not to open in Pennsylvania was not even an effect of the Act but merely a "marketing strategy." *Id.* Further, the court concluded that "[t]he Commerce Clause does not protect the methods of operation in a retail market." ' *Id.* (citing *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978)). Therefore, the Third Circuit determined that "[i]n light of the state interests that the district court found advanced by the Act, these burdens are not 'clearly excessive.' " *Associated Film II,* 800 F.2d at 373. Thus, the constitutionality of the 42–day provision, as applied, was upheld by the Third Circuit under the Commerce Clause scrutiny.

■ Miramax attempts to distinguish the facts of the instant case from *Associated Film II* by arguing that as applied to it, the 42–day provision is clearly excessive since the expansion requires them to close the film at one theater in order to open it at another. However, this Court finds defendant's argument is without merit. Miramax's refusal to play "day and date"[11] with another theater in the Center City area is not mandated by the statute, but is instead a creation of the-

---

11. The testimony of Mr. Sherry from Miramax suggests that this was not Miramax's policy, but instead was Mr. Posel of the Ritz's policy. However, the end result was that Miramax respected the Ritz's policy and did not allow another the-

ater to play a Miramax film day and date with the Ritz. *See* (N.T. 2/27/97, Cross of Posel 100: 5–25, 101: 1–25, 102: 1–5 & Cross of J. Sherry 47: 10–25, 48: 1–25, 49: 1–6).

ater owners in Philadelphia. *See* (N.T. Direct of R. Posel 88: 1–18) (stating he would not play day and date with another center city theater); *but see* (N.T. Direct of Raab February 24, 1997, 27:2–27:20) (stating he suggested to Miramax that they allow him to play the movies at the Roxy day and date with the Ritz). As such, the decision by Miramax to honor the Ritz' request not to play "day and date" with another theater and thus to be in a position where in order to show the film at another theater they must close the movie at the current exhibitor, amounts to little more than a "marketing strategy" as discussed by the district court in *Associated Film I*, 614 F.Supp. at 1117. Therefore the decision by Miramax not to allow the film to play simultaneously with another theater does not represent an undue burden on interstate commerce.

Further, any burden that may be imposed upon Miramax, a single interstate firm, is not an undue burden on interstate commerce since it does not in any way "block or impede the flow of commerce between states." *Allied*, 496 F.Supp. at 439. The 42–day provision does not adversely affect the commerce passing through Pennsylvania, nor prevent any movie distributor from entering and doing business in Pennsylvania.

Thus, according to the mandate of the Third Circuit in *Associated Film II* that the 42–day provision does not violate the Commerce Clause and due to Miramax's failure to produce any evidence of an "excessive burden" on interstate commerce, this Court finds that, as applied to Miramax, section 203–7 does not represent an undue burden on interstate commerce. Defendant's Motion for Judgment as a Matter of Law will, therefore, be denied on the Commerce Clause grounds.

## C. Sufficiency of the Evidence to Prove Causation

Miramax further claims it is entitled to judgment as a matter of law because the evidence at trial was not sufficient to show that any injury suffered by Orson was caused by Miramax' violation of section 203–7. Miramax argues that there was not sufficient evidence for a reasonable jury to find causation on three grounds: 1) there was no evidence that Miramax would have licensed the films at issue to the Roxy if it were not compelled to do so;[12] 2) that with regard to those films that were distributed after August 1993, there can be no showing of causation because Miramax took the Roxy "off service" after the institution of litigation; and 3) that for the films "The Crying Game" and "The Piano," the Roxy could not have demonstrated causation under the statute because those films were "break-out" films that appealed to a larger audience and would, therefore, not have shown at the Roxy. (Def.'s Mem. at 24). Miramax finally claims that for the film "Like Water for Chocolate" the Roxy could not have demonstrated causation as that film was already licensed to the Rittenhouse Theater.

Section 203–10 of the statute requires a showing of a direct causal relationship between the willful and intentional acts of the distributor and the injury suffered by the exhibitor. See 73 P.S. § 203–10. This Court finds that, viewing the evidence in the light most favorable to plaintiff and giving the evidence all reasonable inferences, there was sufficient evidence for the jury to find causation between the conduct of Miramax and the injury suffered by Orson.

Regarding Miramax's first claim, that they would not have licensed any films to the Roxy without being compelled to do so, plaintiff presented sufficient evidence to establish that during the relevant time frame for which the jury awarded damages it was the only "subsequent run" theater normally served by Miramax. See (Pl.'s Trial Exhibit 884 at Exhibit D of Pl.'s Mem.); (N.T. Cross of J. Sherry, 2/29/97, 63:4–25; 64:1–20) (indicating that in 1992 and 1993, the Roxy was the only theater in Center City that showed Miramax films on a subsequent run basis). The evidence establishes that in 1992 Miramax licensed 15 films to the Roxy on a second run basis and in 1993 Miramax li-

---

**12.** Miramax claims there was not sufficient evidence to show that the Roxy even sought licenses to show the particular films at issue.

censed 4 films to the Roxy on a second run basis and that no other Center City theater showed a Miramax film on a second run basis during this time frame. Therefore, there was sufficient evidence from which the jury could find that the Roxy was the subsequent run theater normally served by Miramax during this time frame.[13]

Miramax's claim that Orson could not show causation because there was no indication that the Roxy requested licenses for the films at issue during the relevant time frame, is without merit for several reasons. First, section 203–7 specifically provides that the distributor "shall" make the films available,[14] thus placing the burden on Miramax not on Orson. Notwithstanding the fact that the statute places the burden on Miramax, there was sufficient evidence from which the jury could infer that the Roxy tried to license the films at issue from Miramax during this time frame. The testimony of Mr. Raab, the owner of the Roxy, indicated that he instructed his buyer to obtain any and all Miramax films either on a first run or second run basis—whatever they could get. (N.T. Direct of Raab, 2/24/97, 26: 10–25). Further, Raab testified that he tried to obtain Miramax films by instructing his buyer to: a) offer more money than anyone else in Center City; b) suggest to Miramax that they allow the Roxy to play day and date with the Ritz; and/or c) suggest to Miramax that they give the Ritz a two week head start on a film and then allow the Roxy to begin showing the film day and date with the Ritz. (N.T. Direct of Raab, 2/24/97, 27: 5–19).

Jeffrey Jacobs, the buyer for the Roxy, testified that he tried to no avail to obtain films from Miramax for the Roxy. (N.T. Direct of J.F. Jacobs, 2/25/97, 75–86). This testimony, coupled with the testimony of Mr. Zeidman from Miramax and Mr. Posel from the Ritz that the Ritz would continue to play a film until it was no longer financially viable

to do so, and the fact that Miramax honored the Ritz' request not to play day and date with any other theater, all present sufficient evidence from which a jury could conclude/infer that the Roxy did attempt to obtain a license for the films at issue. See (Pl.'s Mem. at 26–27). Further, there was sufficient evidence for the jury to conclude that the practice in the industry was to make requests for films by phone, and, therefore, there was no need to have written evidence that the Roxy desired to license these films. See (N.T. Direct of J.F. Jacobs, 2/25/97, 72: 16–19 and Cross of J.F. Jacobs, 2/25/97, 93: 9–15).

Miramax's second claim that the Roxy could not show causation for the two films that played after they took the Roxy "off service" is not supported by the statute. As stated supra, Orson has established that it was the subsequent run theater normally served during the time frame, and there is nothing in the statute to indicate that Miramax could avoid this obligation by taking the Roxy "off service" after the institution of litigation. See 73 P.S. § 203–7.

Regarding the films "The Crying Game" and "The Piano," there was sufficient evidence for the jury to conclude that the Roxy would have exhibited these films if they were available to them. As stated supra, the Roxy sufficiently established that they were the subsequent run theater normally served, as required by section 203–7 of the Act. Therefore, regardless of Miramax's conjecture that due to the success of the films the Roxy would not have obtained a license to exhibit them had the films been expanded, there was sufficient evidence for the jury to conclude that had Miramax complied with section 203–7 of the Act and expanded to the subsequent run theater normally served, that the films would indeed have gone to the Roxy. Further regarding "Like Water for Chocolate," which Miramax claims could not be shown at the Roxy because it was licensed to be shown at

---

13. Although Mr. Sherry, who is a current Miramax employee, testified that he would have tried to place the films at theaters other than the Roxy, there was no evidence that this would have been the policy of Miramax during the relevant time frame.

14. Miramax claims that such a reading of the statute would render the statute unconstitutional as it would constitute a violation of the Supremacy Clause and the Copyright Act. However, as that issue has been resolved against Miramax by the mandates of the Third Circuit, that argument has no merit with regard to the sufficiency of the evidence.

the Rittenhouse, plaintiff is correct in noting that the Rittenhouse did not show the film until one year after the date the film would have been available for a subsequent run as required by the statute. *See* (Pl.'s Mem. at 30).

Therefore, there was sufficient evidence on the record for a reasonable jury to find that Miramax caused the injury to Orson as required by section 203–10. Accordingly, Miramax's Motion for Judgment as a Matter of Law on these grounds is denied.

### D. Sufficiency of Evidence to Show a Willful and Intentional Violation of 203–7

Miramax also makes a Motion for Judgment as a Matter of Law based on the fact that section 203–10 of the statute requires a showing of willful and intentional behavior. Miramax claims that there is insufficient evidence from which a jury could conclude that they willfully and intentionally violated the statutory provisions since they introduced evidence that they did not understand the meaning of the terms of the statute. *See* (Def.'s Mem. at 25). Miramax claims that it interpreted the term geographical area to mean that on the 43rd day, they must expand to the suburbs/rural areas surrounding Center City, not to another theater within Center City.[15] Thus, Miramax argues that it thought it was in compliance with the statute. Further, Miramax claims that with regard to the ten (10) films for which it sent trade notices to Orson, the responsibility for asking for the film was on the exhibitor, so it could not have willfully and intentionally violated the statute with regard to those films. *See* (Def.'s Mem. at 27).

■ Whether Miramax had the appropriate state of mind to be found liable for an intentional and willful violation of the Pennsylvania Act is a factual question that is appropriate for the jury to decide. *See Riehl v. Travelers Ins. Co.*, 772 F.2d 19 (3d Cir. 1985). In the instant case this is especially so as the jury had to make a finding of Miramax's state of mind from inferences from the evidence presented. *See Id.* at 24.

■ This Court finds that there was sufficient evidence on the record for the jury to make the determination that Miramax acted in a willful and intentional manner. The jury was presented with the deposition testimony of Robert and Harvey Weinstein, who are the co-chairmen of Miramax, and Martin Zeidman, head of domestic distributions for Miramax during the relevant time frame, to indicate the state of mind of Miramax. Further the jury was presented with evidence of Miramax's violation of section 203–4, another provision of the statute, from which a reasonable jury could infer that the violations of section 203–7 were not inadvertent.

Accordingly, this Court concludes that there was sufficient evidence from which the jury could find that Miramax acted willfully and intentionally in not expanding the films within the geographic area.

### E. Sufficiency of Evidence to Show Damages Claim

Miramax further claims it is entitled to judgment as a matter of law because the evidence presented by plaintiff's expert, Mr. LaRosa, was not sufficient to sustain a finding of damages in the amount awarded by the jury. Miramax's specific complaint is that LaRosa's testimony was based on assumptions not supported by facts in the record. Miramax claims LaRosa made the following unsupported assumptions: 1) "he [LaRosa] assumed that every film that, hypothetically, would have shifted from the Ritz to the Roxy on the 43rd day would have played at the Roxy for the same amount of time as that film actually played at the Ritz" and 2) that "Mr. LaRosa assumed that every patron that saw the film at the Ritz during its run would have come to the Roxy to see the film in his hypothetical world." (Def.'s Mem. at 29). Defendant argues that these faulty assumptions led to an unreliable damages calculation.

■ "[T]he calculation and assessment of damages is a question of fact that is reserved for the jury." *Medcom Holding Co. v. Baxter Travenol Laboratories*, 106

---

**15.** *But see Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1374 (3d Cir.1996) (determining that

Pennsylvania Act requires expansion within the Center City area).

F.3d 1388, 1400 (7th Cir.1997). The jury is not bound by expert testimony presented in the case. *See Weil v. Seltzer*, 873 F.2d 1453, 1466 (D.C.Cir.1989). Instead, "[t]he evaluation of the experts' opinions and the application of evidence as to their underlying assumptions, [are] matters for the jury." *Crues v. KFC Corp.*, 729 F.2d 1145, 1151 (8th Cir.1984). "The factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Loudermill v. Dow Chemical*, 863 F.2d 566 (8th Cir.1988). However, expert testimony cannot be based on sheer speculation or conjecture; that is, it cannot be "so fundamentally unsupported that it can offer no assistance to the jury." *Id.*

▇▇ After a thorough review of the record, this Court concludes that LaRosa's testimony is not "so fundamentally unsupported that it can offer no assistance to the jury." There is sufficient evidence on which LaRosa could base his numerical calculations. LaRosa based his assumption on the length of time the film would play at the Roxy and on the number of film-goers who would come to the Roxy to see the film on the record of evidence as follows: 1) the testimony of Max Raab, Jennifer Steinberg, and Judith Friedman that art film viewers in Philadelphia would go to any theater playing the film to see it; 2) the testimony of Mr. Posel who indicated he would not play day and date with another theater because it would be the same consumer base, which indicates that the same viewers who saw a film at the Ritz would see the film at the Roxy; and 3) the record evidence that the Roxy was the only other art film theater in Center City besides the Ritz. See (Pl.'s Mem. at 38). This evidence provides a basis for the expert's conclusion that the film would have played as long at the Roxy as it did at the Ritz and that the same number of film viewers would have seen the film at the Roxy as saw it at the Ritz.

Further, Miramax had ample opportunity, which was utilized, to demonstrate any defects in LaRosa's calculations on cross examination. It is clear from the verdict of the jury that LaRosa's calculations were not adopted in toto; [16] rather, the jury awarded a lesser amount based on their own findings of fact and presumably based on the opinions of both plaintiff's and defendant's expert.

As there was sufficient evidence in the record on which LaRosa could base his opinion, Miramax's Motion for Judgment as a Matter of Law or a New Trial based on the admission of LaRosa's testimony is denied.

### III. Motion for a New Trial Pursuant to Rule 59

### A. Allowing Evidence of 203–4 Violation

Miramax also requests a new trial due to this Court's alleged error in admitting evidence of Miramax's violation of section 203–4 of the Pennsylvania Act.[17] Miramax claims that since this Court granted their Rule 50(a) Motion for Judgment as a Matter of Law concerning section 203–4, that this Court should not have allowed any evidence of the violation of that statutory provision. (Def.'s Mem. at 32).

▇▇ Federal Rule of Evidence 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This rule is read in conjunction with Federal Rule of Evidence 403 which provides:

[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

---

**16.** LaRosa estimated the Roxy's losses to be $519,362. (N.T. Direct of LaRosa, 3/3/97, 48: 3–15). The jury awarded $159,780.

**17.** Section 203–4 is the provision of the statute regulating trade screenings. 73 P.S. § 203–4.

In order to admit evidence of violations not at issue in the case but that meet the exception as outlined in 404(b), there must be a balancing to ensure that the probative value is not outweighed by the prejudicial value of the evidence. *See United States v. Lebovitz,* 669 F.2d 894 (3d Cir.1982)..

■ This Court determined at trial and affirms here that as the probative value outweighed the prejudicial value, admission of evidence of a violation of 203–4 was proper to show the intent and state of mind of defendant. *See* (Trial Transcript, 2/28/97, 2–6: 28–29, 140–42). Therefore, defendant's Motion for a New Trial due to admission of this evidence is denied.

*Jury Instructions*

■ Defendant further claims they are entitled to a new trial due to this Court's instruction to the jury concerning the legislative purposes articulated in the Pennsylvania Act. *See* "Legislative findings and purposes," 73 P.S. § 203–2. Miramax claims that the actual language of section 203–7 of the statute should have controlled the jury's deliberation and that allowing the jury to consider the articulated legislative purposes took that obligation away from the jury. (Def.'s Mem. at 33).

The trial transcript indicates that this Court fully and explicitly made apparent to the jury what section 203–7 requires. Each element of section 203–7 was described in detail, and the jury could not have been confused as to its function in determining whether section 203–7 had been violated. See (Trial Transcript, Instructions to Jury, 2/28/97, 18–28). Given this, there are no grounds for a new trial based on admission of this evidence. There will be no miscarriage of justice if the verdict is allowed to stand.

■ Defendant further claims they are entitled to a new trial because this Court did not fully explain to the jury "what is legally required to find a violation of section 203–7." (Def.'s Mem. at 33). Defendant claims that this Court's failure to instruct the jury that

1) Orson had to prove it requested films from Miramax after the 42nd day and 2) Orson had to prove that Miramax entered into an exclusive agreement for showing the film for more than 42 days constituted error of such proportions that they must now be granted a new trial.˙ (Def.'s Mem. at 33–34).

After a thorough review of the record, this Court finds that Miramax's claims are without merit. The language of the statute in no way indicates that Orson must show that it specifically requested the films at issue.[18] Instead, the statute puts the onus on the distributor to make the films available to the subsequent run theater normally served. Accordingly, to have instructed the jury that Orson had to prove it requested the films would have been erroneous. Further, this Court did instruct the jury that they must find that Miramax entered into an exclusive agreement to show the film in excess of 42 days. See (Trial Transcript, 2/28/97, 20: 12–22, 21: 20–25, 22: 1–6, 24: 9–17, 24–26: 23–25, 1–5, 27–28, 23–25, and 1–2). Thus, Miramax's motion for a new trial based on these instructions will be denied.

*IV. Conclusion*

An appropriate Order follows.

**ORDER**

AND NOW, this —— day of November, 1997, upon consideration of Defendant's Motion for Judgment as a Matter of Law or in the Alternative New Trial, Plaintiff's Response thereto and Defendant's Reply Memorandum, it is hereby ORDERED that, for the reasons set forth in the foregoing Memorandum, the Motion is DENIED.

---

**18.** However, see the discussion supra concerning the sufficiency of the evidence to prove causation under the statute. This discussion shows that Orson did indeed establish that it wanted each of the films for which the jury found liability.